**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

THE CHARTER OAK FIRE INSURANCE
COMPANY a/s/o UTICA COLLEGE,

                    Plaintiff,

     v.

YEADON FABRIC DOMES, LLC, YEADON
FABRIC STRUCTURES, LTD and YEADON
FABRIC DOMES, INC.,

                    Defendants.

                            6:20-cv-00496 (AMN/MJK)

YEADON FABRIC DOMES, LLC, and YEADON
FABRIC STRUCTURES, LTD,

                    Third-Party Plaintiffs,

     v.

TEMCO SERVICE INDUSTRIES, INC.,

                    Third-Party Defendant.

**APPEARANCES:**                                    **OF COUNSEL:**

**SHEPS LAW GROUP, P.C.**                   **ROBERT C. SHEPS, ESQ.**
25 High Street                                      **GREGG E. OPELL, ESQ.**
Huntington, NY 11743
*Attorneys for Plaintiff*

**AHMUTY, DEMERS & MCMANUS, ESQS.**      **PATRICK J. PICKETT, ESQ.**
634 Plank Road
Suite 203A
Clifton Park, NY 12065
*Attorneys for Defendants/Third-Party Plaintiffs*

**LESTER SCHWAB KATZ & DWYER, LLP**    **DAVID H. MOTOLA, ESQ.**
100 Wall Street    **THOMAS B. COPPOLA, ESQ.**
New York, NY 10005
*Attorneys for Third-Party Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I.   INTRODUCTION

On March 12, 2020, The Charter Oak Fire Insurance Company a/s/o Utica College ("Plaintiff" or "Utica College") commenced this action in New York State Supreme Court, Oneida County, against Yeadon Fabric Domes, LLC, Yeadon Fabric Structures, LTD, and Yeadon Fabric Domes, Inc. (collectively "Defendants/Third-Party Plaintiffs" or "Yeadon"), seeking recovery for damages sustained on March 14, 2017 during a large snow event, from the collapse of a recreational air-supported sports dome (the "Dome" or "the Utica Dome"), owned by Utica College and manufactured and designed by Yeadon.  Dkt. No. 2 ("Complaint").  Utica College asserts four causes of action against Yeadon: (1) negligence; (2) strict products liability; (3) breach of warranty; and (4) breach of contract.  *See generally id*.  Utica College is seeking monetary compensation totaling $3,434,276.34 for damages incurred from the collapse of the Dome, including the cost of replacing the Dome.  *Id.* at ¶¶ 2-3.

On May 1, 2020, Yeadon filed a Petition for Removal to the Northern District of New York.  Dkt. No. 1.  On May 21, 2021, Yeadon filed a third-party complaint against Temco Service Industries, Inc. ("Third-Party Defendant" or "Temco"), seeking common law indemnification and contribution as to the causes of action in the Complaint for negligence, strict products liability, and breach of warranty.  Dkt. No. 35 ("Third-Party Complaint").  In its Third-Party Complaint, Yeadon alleges that Temco was negligent in its maintenance, control, and monitoring of the Utica Dome both prior to the snowstorm and on the day of the Dome's collapse.  *See generally id*.  In its answer

2

to the Third-Party Complaint, Temco asserts counterclaims against Yeadon for common law indemnification and contribution for any judgment against it.  Dkt. No. 43.

Presently before the Court is Yeadon's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), seeking dismissal of Plaintiff's Complaint and Temco's Third-Party Counterclaims.  Dkt. No. 60 ("Yeadon's Motion").  Utica College submitted an Opposition to Yeadon's Motion, Dkt. No. 68 ("Opposition"), and Yeadon Replied, Dkt. No. 71.  Also before the Court is Temco's Motion for Summary Judgment pursuant to Rule 56 seeking dismissal of the Third-Party Complaint.  Dkt. No. 59 ("Temco's Motion").  Yeadon submitted an Opposition to Temco's Motion, Dkt. No. 67, and Temco Replied, Dkt. No. 74.[1]

For the reasons set forth below, Yeadon's Motion is granted in part and denied in part, and Temco's Motion is granted in its entirety.

## II.      BACKGROUND[2]

### A.  Contract between Yeadon and Utica College

On March 5, 2015, Yeadon entered into a contract with Utica College ("Yeadon Contract") to provide "a new multi-sport air-supported structure, measuring 270 feet wide by 500 feet long by 81 feet high." Dkt. No. 60-3 at ¶¶ 1-2.[3]   The Dome's membrane was "made up of two layers

---

[1] Citations to court documents, including deposition transcripts, utilize the pagination generated by CM/ECF, the Court's electronic filing system.

[2] Unless otherwise indicated, the following facts have been asserted by the parties in their Statements of Material Facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  *Compare* Dkt. No. 59-20 (Temco's Rule 56.1 Statement of Material Facts) *with* Dkt. No. 67-2 (Yeadon's Response); *compare* Dkt No. 60-3 (Yeadon's Rule 56.1 Statement of Material Facts) *with* Dkt. No. 68-5 at ¶¶ 1-119 (Utica College's Response); *compare* Dkt. No. 68-5 at ¶¶ 120-138 (Utica College's Statement of Material Facts) *with* Dkt. No. 71-1 (Yeadon's Response).  The Court has also considered the parties' other submissions and attached exhibits.  *See generally* Dkt. Nos. 59, 60, 67, 68, 71, 74.

[3] Matt Mejia, Yeadon's President and CEO, testified that the Utica Dome was on the "longer end" of Yeadon's normal sized domes, and that the largest dome Yeadon built was located in Alaska

of Teflon-coated polyester fabric separated by a layer of insulation. The membrane [was] supported by air pressure that [was] regulated by a mechanical inflation system that circulate[d] air in and out of the Dome. The membrane [was] held down by reinforcing cables anchored to a concrete grade beam along the perimeter of the Dome." Dkt. No. 59-17 at 3. There was a one-story brick building near the southwest corner of the Dome. *Id.* at 5.

The Yeadon Contract included two inflation units with furnaces, a remote access thermostat,[4] a built-in standby inflation package,[5] and an Automation Package.[6] Dkt. No. 60-3 at ¶¶ 3-5. Utica College also purchased from Yeadon certain add-on features, including a snow

---

and it collapsed on January 22, 2017 partly due to a failure to timely remove snow. Dkt. No. 59-20 at ¶ 20; Dkt. No. 60-12 at 52:17-25, 82:23-83:11; Dkt. No. 68-5 at ¶ 14. Mr. Mejia further testified that Yeadon built a "dome of similar size" to the Utica Dome in Vadnais, Minnesota, which also collapsed. Dkt. No. 60-12 at 53:16-54:4; Dkt. No. 68-5 at ¶ 14. No modifications or changes were made to the Utica Dome "after it was constructed but before its collapse." Dkt. No. 60-3 at ¶ 99.

[4] The remote access thermostat "allowed the [D]ome's internal pressure and temperature to be operated from a remote location." Dkt. No. 60-3 at ¶ 3.

[5] A "built-in standby inflation package" "allows for backup inflation when the main inflation system is out of service or a power outage occurs." Dkt. No. 60-20 at ¶ 6.

[6] Utica College purchased an "Automation Package" which was an electronic board "programmed to make changes to the pressure based upon outside wind speeds." Dkt. No. 68-5 at ¶ 130. The Automation System "allowed the internal pressure [of the Utica Dome] to be adjusted based [on] outside wind speed by modulating the return air dampers and vary[ing] the fan speed in the inflation units to optimize the building pressure to allow for energy efficient operation." Dkt. No. 60-3 at ¶ 5. Daniel Bollana, Utica College's Executive Director of Facilities Planning and Operations, explained that the Dome "for the most part, is automated and operates on its own" and the Automation System "plac[ed] the [D]ome in the proper pressures and temperatures." Dkt. No 60-10 at 21:25-22:3, 27:7-10. The Automation System also allowed the Utica Dome to be monitored from an off-site location so that physical presence on site was not required to monitor the Dome at all times. Dkt. No. 60-3 at ¶¶ 111-12.

sensor,[7] remote monitoring tools,[8] and wind temperature controls.  *Id.* at ¶¶ 45, 110; Dkt. No. 68-5 at ¶ 131.

The Yeadon Contract warrantied the outer fabric of the Dome, which was manufactured by Seaman Corporation ("Seaman").  Dkt. No. 60-3 at ¶¶ 6, 50.  The Yeadon Contract also contained a warranty which excluded "the fabric, motors, blowers, emergency generators, heating and air conditioning units, controls, thermostats, lighting fixtures, structural cables and protective screens, netting or any other items or equipment used or supplied for the air-supported structure," and which was "limited to the warranty provided by the manufacturer of the aforementioned fabric and equipment, in lieu of any other warranty, express or implied." *Id.* at ¶ 9.[9]  The Yeadon Contract excluded other warranties in a clause stating:

> **EXCLUSION OF OTHER WARRANTIES.**  EXCEPT FOR THE EXPRESS WARRANTY HEREIN, THERE ARE NO OTHER WARRANTIES, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR PURPOSE, APPLICABLE TO THE AIR-SUPPORTED STRUCTURE . . . . NO WARRANTIES OR REPRESENTATIONS AT ANY TIME MADE BY ANY SALES REPRESENTATIVE, DEALER, AGENT OR ANY PERSON SHALL BE EFFECTIVE TO VARY OR EXPAND THE ABOVE EXPRESS WARRANTY OR ANY OTHER TERM HEREOF.

*Id*. at ¶¶ 11-12.  The Yeadon Contract further contained a "limited liability provision":

> **LIABILITY LIMITATION**.  Yeadon shall not be liable in contract or in tort

---

[7] "The snow sensor's purpose was to increase pressure and temperature to the [D]ome in the event the owner was not there to do it his or herself.  The sensor consisted of a cup that would collect and sense moisture in the air when the ambient temperature was below 32 degrees.  This would then trigger a series of contacts in the sensor that would increase pressure and increase heat to the [D]ome."  Dkt. No. 68-5 at ¶ 132.

[8] Yeadon's Operating and Maintenance Manual stated that: "[r]emote accessibility may be part of the automation program.  This allows the owner to access critical data like pressure, temperature and other desired items.  It also allows the owner to override settings and adjust to new ones if desired."  Dkt. No. 60-3 at ¶ 48.

[9] The warranty also "exclude[d] any damage or failure occasioned by abnormal weather conditions."  Dkt. No. 60-3 at ¶ 10.  Utica College admits the term "abnormal weather conditions" is used in the contract, but states that the term is "not defined."  Dkt. No. 68-5 at ¶ 10.

(including negligence) for loss of profits or revenue, loss of use of equipment or facilities, cost of capital, or for any special, indirect, incidental or consequential damages of any nature resulting from or in any manner relating to the air-supported structure covered hereby, its design, use, any inability to use the same or any delay in delivery of the same.

Dkt. No. 60-20 at 7.

Additionally, Yeadon agreed in the Contract to provide "necessary calculations and construction related drawings" for the Utica Dome design.  Dkt. No. 60-20 at ¶ 22.[10]  On October 1, 2015, Utica College received a "Handover Certificate" from Yeadon which provided that Utica College "accepts the air-supported structure," and that its acceptance "notes that the work is substantially complete."  Dkt. No. 60-3 at ¶ 93; Dkt. No. 60-22 at 1.  On November 16, 2015, a Certificate of Occupancy was issued to Utica College noting that there were "no visible defects at [t]ime of [i]nspection."  Dkt. No. 60-3 at ¶ 94; Dkt. No. 60-25 at 1.[11]

## B.      Temco's Responsibilities to Utica College

---

[10] Yeadon retained an engineering firm, THP Limited, Inc. ("THP"), to "provide structural design services" for the Utica Dome, which included confirming that the design plans complied with New York State regulations, including confirming that the load calculations were in compliance with local building codes.  Dkt. No. 60-3 at ¶¶ 16, 23-24; Dkt. No. 60-12 at 29:18-23; Dkt. No. 60-28 at 2.  THP stamped a set of architectural drawings labeled AS-1 through AS-7, Dkt. No. 60-18 at 179-85, which were submitted to the City of Utica Building Department prior to obtaining a building permit for the Utica Dome.  Dkt. No. 60-3 at ¶¶ 22, 24-25.  Drawing AS-2 contained "General Notes" including that the Dome was designed to the "manual method" of snow removal, and if "snow is forecast, the owner must have personnel available to monitor and remove snow as required during the storm event."  Dkt. No. 60-3 at ¶ 28; Dkt. No. 60-18 at 180.

[11] The Chief Building Inspector for the City of Utica, Daniel Cozza, testified that a Certificate of Occupancy "means that the City of Utica has completed their role in overseeing the [Utica Dome project] and that it now can be used and occupied by the general public."  Dkt. No. 60-11 at 57:5-9.  Cozza further testified that he inspected whether the Utica Dome complied with the drawings submitted to the Department of Buildings, and he would not have issued a Certificate of Occupancy if he believed the Dome to be dangerous.  *Id.* at 55:16-57:2.  Cozza also testified that Utica County Building Department inspectors do not calculate every engineering sketch and diagram, as the responsibility to make sure that the Building Code is "properly followed fall[s] exclusively upon the submitting engineer," and issuing a Certificate of Occupancy did not guarantee that the Dome "met New York State [C]ode for structural stability."  *Id.* at 16:11-17:5, 71:13-72:8.

From October 2015 until March 2017, the Dome "was operated, maintained, and controlled by Utica College and/or its contractor, Temco." Dkt. No. 60-3 at ¶ 95. Temco provided custodial and ground-level snow removal services to the College. Dkt. No. 59-20 at ¶ 22.

An unsigned contract between Utica College and Temco ("Temco Contract"), dated June 1, 2008, specified the following responsibilities for Temco and Utica College:

> (a) Temco accepts the responsibility for the supervision, cleaning/housekeeping at Utica College (b) Temco will make all salary payments and provide the fringe benefit program for all custodians, housekeepers, building maintenance and grounds maintenance Personnel [and] (c) The College will supervise, direct and be responsible for all building maintenance and grounds care involved in this phase of the physical plant operation.

Dkt. No. 59-10 at 2.[12]

Utica College relied on Temco to "monitor, maintain and control" the Utica Dome. Dkt. No. 60-3 at ¶ 96. Temco was able to both monitor the Dome's automated controls and manually operate the Dome. *Id.* at ¶ 97. Michael Durant, Temco's heating, ventilation, and air conditioning ("HVAC") technician, testified that when there is snow, a grounds crew employed by Temco "was tasked with . . . removing the snow around the base of the [D]ome," but he had never observed any member of the grounds crew manually removing snow off the Dome. Dkt. No. 60-15 at 26:15-27:22. Additionally, Daniel Bollana, Utica College's Director of Facilities, testified that Temco's duties included "snow removal around the [D]ome and [] maintaining the area around the [D]ome to make sure that the area was kept free of debris, and . . . mak[ing] sure that all of the operational parts of the [D]ome were functioning." Dkt. No. 60-21 at 37:8-17.

### C.  Materials and Training Provided by Yeadon

---

[12] Yeadon did not have a contract with Temco with respect to the maintenance and operation of the Utica Dome. Dkt. No. 59-20 at ¶ 23.

### 1. Owner's Manual and Drawings

After the Dome was completed, Yeadon provided Utica College with a set of drawings and maintenance manuals, including Yeadon's Operating and Maintenance Manual, (the "Owner's Manual"), which explained how to operate the Utica Dome.  Dkt. No. 60-3 at ¶¶ 29-32, 109; Dkt. No. 60-18.  The Owner's Manual provided guidance with respect to heavy snow accumulation.  Dkt. No. 60-3 at ¶¶ 33-36.  For example, under the section "Snow Accumulation," the Owner's Manual states:

> Air Supported Structures *are designed to shed snow through a combination of pressure, curvature and some heat transfer.*  While effective, *it is possible, under some scenarios, for snow to accumulate on the top, along the perimeter base or on the door attachment curtains*.  If this condition occurs, the owner *must take steps to manually remove the snow immediately*.  *This means that snow must NOT be allowed to accumulate on the top of the bubble, around the dome base or on connecting curtains* . . . . If heavy snow is anticipated set internal pressure to high[,] leave heat turned on [, and if] a snow sensor is present, make sure it has locked in pressure and temperature. If near freezing conditions are present, switch to manual settings . . . .  If snow does accumulate . . . Call Yeadon's Hot Line, 519-763-5962 to get verbal instructions . . . [and] *[p]ull a rope, in a sawing motion, back and forth over the top of the dome* . . . . This function may need to be done several times to remove the build up and it may need to be repeated during extended snow storms.

Dkt. No. 60-3 at ¶¶ 33-36; Dkt. No. 60-18 at 9-10 (emphasis added).  The Owner's Manual also included a section, "Emergency Procedures," which warned the Owner to be aware of "present and future weather conditions at all times," and provided guidance regarding actions to be taken during heavy snow, including that snow should be removed "around the perimeter as needed," and "[w]hen in doubt, call [the] Yeadon Hotline."  Dkt. No. 60-3 at ¶ 42; Dkt. No. 60-18 at 17-18.[13]

---

[13] The Owner's Manual had an Addendum which included a section, "Snow Accumulation."  Dkt. No. 60-18 at 11.  The Addendum provided that if Utica College is unable to visually see if there is snow accumulation on top of the Dome during a heavy snowfall, it must have "an accurate laser measuring device" which "is to be used during heavy snowfall every 2 to 4 hours, depending on the rate of snowfall and the temperature. If the dome deflects 3'6", the owner needs to perform manual snow removal to dislodge the snow and allow it to shed off the top of the dome.  Once the

The Owner's Manual also addressed the use of the Automation System for shedding snow as well as when it may be appropriate to manually remove snow.[14]  Dkt. No. 60-18 at 34. Specifically, the Owner's Manual stated that the Automation System was meant to "add efficiency and reliability to the [D]ome operation," and that during a snowstorm, the Dome is automatically placed into "snow mode"[15] in which:

> [t]he snow sensor (if any) will read temperature and moisture.  When a sustained snowfall occurs, moisture and temperature are detected.  The snow sensor will override the wind sensor and automatically adjust the dome's internal pressure to 1.9" w.c.  It will also turn the heat on to between 65 and 68 degrees.  This gives the owner automatic high pressure and some heat transfer to assist in shedding snow. The temperature and pressure stay locked in until the owner manually removes the snow from around the dome's perimeter.

Dkt. No. 60-3 at ¶ 47; Dkt. No. 60-18 at 24.

The Owner's Manual also provided that while "Automation systems can be relied on to adjust the dome's pressure in non gusty conditions for energy efficiency, set temperatures, and adjust the dome for snow conditions[,] [i]t is important to remember that this does not mean you can walk away from the dome.  There is still maintenance and scheduled tests that need to be

---

snow has shed, the owner should remove it from the perimeter base.  This operation must continue until the snowfall has ceased . . . . If there is any concern or problem . . . call Yeadon's hotline." Dkt. No. 60-3 at ¶¶ 40-41; Dkt. No. 60-18 at 11.

[14] The Owner's Manual and Addendum explained that "[t]he prescribed manual method of removing the snow . . .  is to pull a rope back and forth over the [D]ome (the "Rope Method"). This sawing method will break up and dislodge the snow to allow it to shed off the structure.  The operation requires 2 to 4 people under most conditions."  Dkt. No. 60-18 at 10-11.  The Rope Method of snow removal is comprised of dragging a 600-foot rope over the roof of an 8-story high dome.  Dkt. No. 68-5 at ¶ 135 (citing Dkt. No. 60-12 at 207:25-208:8).  The parties dispute whether the Rope Method is "standard" practice for snow removal on domes of a size similar to the Utica Dome.  *Compare* Dkt. No. 60-3 at ¶ 18 *with* Dkt. No. 68-5 at ¶ 18.

[15] Mejia explained that "snow mode" is a component of automation.  Dkt. No. 60-14 at 26:12-13. Steven Flanagan, a consultant for Yeadon, testified that when the Dome is in "snow mode," it will "read temperature and moisture and put the [D]ome into a locked position at a high temperature to keep the furnace running."  Dkt. No. 60-16 at 39:22-40:4.

performed."  Dkt. No. 60-3 at ¶ 44.  The Owner's Manual further explained that "[i]t is important to know that the automation system must not be used in gusty wind conditions for the wind sensor and in near freezing conditions for the snow sensor.  The automation systems must be turned to manual in these conditions."  Dkt. No. 60-18 at 24.

### 2.    In-Person Training

Matthew Mejia, who was the person designated by Yeadon to conduct training, conducted two in-person training sessions of approximately 45-minutes each to Utica College and Temco employees regarding the operation of the Utica Dome.  Dkt. No. 60-3 at ¶¶ 58, 107; Dkt. No. 60-12 at 151:7-10; 60-14 at 41:5-25.  During the training sessions, Temco was provided with the Owner's Manual and given Yeadon's Hot Line telephone number and Mejia's personal cell phone number.  Dkt. No. 60-3 at ¶¶ 60, 65.

The parties disagree as to whether manual snow removal was included in the training.  Mejia testified that the training included "monitoring the [D]ome for snow and what to do in the event of a snowstorm."  *Compare* Dkt. No. 60-3 at ¶ 61 *with* Dkt. No. 68-5 at ¶ 61.  Mejia further testified that the training included discussion of the Rope Method and how to utilize the laser measuring device to determine if there is an accumulation of snow on the Dome.  Dkt. No. 60-3 at ¶ 62; Dkt. No. 60-12 at 194:4-18.[16]  Mejia explained that while the Utica Dome has an Automation System, during extreme weather conditions the Dome should be put in manual mode because it "is more stable than snow mode," and snow mode should only serve as a "backup for the human."

---

[16] Utica College admits that it never purchased ropes to manually remove snow from the top of the Dome and Temco never performed snow removal from the top of the Dome.  Dkt. No. 68-5 at ¶¶ 68-69.  Utica College provided Temco with a laser measuring device which Temco used once "to obtain a baseline measurement [and] then placed in a closet and never used again."  Dkt. No. 60-3 at ¶¶ 66-67.

Dkt. No. 60-14 at 26:22-28:20.[17]  Mejia further explained that while it would not be a violation of Yeadon's training or its manuals if the Utica Dome is only in snow mode, and not manual mode, it would be a violation if the Dome was not also monitored while in snow mode.  *Id.* at 29:18-30:2.

On the other hand, Durant testified that during the two training sessions he was never told to use the Rope Method to remove snow from the top of the Dome during a snow event.  Dkt. No. 60-15 at 80:16-81:23.[18]  Additionally, Mejia testified that Yeadon typically does not recommend that "customers go on top of their dome" to manually remove snow, and if customers choose to go on top of the dome during a storm, Yeadon recommends that they take "all appropriate safety precautions," including using a lift and harness.  Dkt. No. 60-12 at 88:3-90:4.

Durant further testified that Yeadon made Temco believe the systems that operate the Dome "were automatic and that upon detection of moisture below a certain temperature on the sensors that the systems would automatically adjust and go into snow mode," and during a snowstorm, Temco did not need to do anything but set the Utica Dome in snow mode to be safe during a storm.  Dkt. No. 60-15 at 46:3-11, 81:4-9; Dkt. No. 68-5 at ¶ 133.[19]  Durant noted that while he was told during the training sessions that there was an option to switch from automatic to manual mode, he did not recall Mejia saying he was required to do so unless the automatic controls failed.  Dkt. No. 60-15 at 46:18-24.  Durant also never observed Temco remove snow manually

---

[17] From October 2015 until Spring 2016, Temco operated the Utica Dome manually before automated features of the Dome were fully operational.  Dkt. No. 60-3 at ¶ 100.

[18] Flanagan, Yeadon's consultant, testified that he did not know if any Utica College employee received training on the Rope Method.  Dkt. No. 60-17 at 32:13-17.

[19] Durant testified that following the trainings, he "placed the Owner's Manual in a drawer in the Facilities Office and never referred to it again."  Dkt. No. 60-3 at ¶ 63.  Additionally, Bollana did not review the Owner's Manual or drawing AS-2 whose "General Notes" refers to the "manual method" of snow removal.  *Id.* at ¶ 54.

11

from the top of the Dome.  Dkt. No. 60-3 at ¶ 69.  Further, Bollana testified that he was told the Dome was "fully automated" and that it "shouldn't need to go into manual mode," and he did not learn until after the Dome's collapse that the Owner's Manual discussed the removal of snow from the top of the Dome using the Rope Method.  Dkt. No. 60-10 at 90:8-17; 135:22-136:6.[20]

### D.  The Underlying Incident

Temco's maintenance department worked each day from 7:00 a.m. to 3:30 p.m, and outside of those hours, Utica College had Campus Security who were "not trained on the operation or maintenance of the Dome" check on the Utica Dome.  Dkt. No. 60-3 at ¶¶ 73-76.  On Tuesday, March 14, 2017, Utica College was impacted by winter storm Stella with heavy snowfall.  Dkt. No. 59-20 at ¶¶ 2-3.[21]  On that day, Utica College was on spring break, classes were not in session, and the College closed early due to the snowstorm.  Dkt. No. 60-3 at ¶¶ 77, 88.

Durant testified that before the Temco HVAC maintenance staff left that day, they checked the Utica Dome data and made sure that it was operating properly and in snow mode.  Dkt. No. 60-15 at 54:17-24.[22]  Bollana testified that when the Utica Dome went into snow mode, "the automated system . . . was supposed to take care of the snow that was accumulating on the [D]ome"

---

[20] While Mejia testified that he remembered Bollana being a part of the training, *see* Dkt. No. 60-12 at 155:24-156:3, Bollana testified that he did not undergo any training from any Yeadon representative," Dkt. No. 60-10 at 20:19-21:6.

[21] Utica College and Temco disagree with Yeadon over the amount of snow accumulation. *Compare* Dkt. Nos. 59-20 at ¶ 2, 68-5 at ¶ 83 (noting that ground snow per the National Oceanic and Atmospheric Administration was measured to be 22" to 23" at the approximate time of the Dome's collapse) *with* Dkt. Nos. 67-2 at ¶ 2, 60-3 at ¶ 83 (noting that there was "approximately 30.2 inches of snow accumulated in the vicinity of 1600 Burrstone Road, Utica, NY" and the "subject snowstorm brought 34-40 inches of snow at Utica College").

[22] While Durant "had to ability to connect remotely to monitor and operate the Dome's systems," he was not assigned on the day of the collapse to operate the Dome from home because this would constitute overtime, and he would not be paid.  Dkt. No. 60-3 at ¶ 72; Dkt. No. 60-15 at 15:5-25. Durant further testified that other than himself, no Temco employee could remotely monitor the Dome from home.  Dkt. No. 60-15 at 56:11-57:3.

and he was never advised to switch the Dome to manual mode.  Dkt. No. 60-10 at 56:13-24.

Additionally, both Bollana and Durant testified that before the Dome's collapse, snow was cleaned "around the [D]ome" but neither Bollana nor Durant received any warning that the Dome was in danger of collapsing.  Dkt. No. 60-10 at 120:4-8; Dkt. No. 60-15 at 67:9-22.  On March 14, 2017, Temco cleared snow on the base, but not on the top of the Dome, and other than that, Temco did not "do anything with respect to snow removal on the [D]ome," including removing sharp objects from inside the Dome.  Dkt. No. 60-10 at 100:20-24, 108:22-25.  Bollana also testified that Durant told him the system was operating as it should and "showed [him] some screenshots of the temperature and pressure."  Dkt. No. 60-21 at 55:2-56:17.  No one from either Temco or Utica College called the Yeadon Hotline or Mejia that day.  Dkt. No. 60-3 at ¶ 90.

At approximately 8:00 p.m. on March 14th, the Dome collapsed.  *Id.* at ¶ 78.  "[T]he internal dome pressure and temperature remained at 1.9" to 2" w.c. and 65 degrees [Fahrenheit ("F")], respectively, throughout the day until approximately 7:30 p.m., when they both dropped. The internal pressure dropped to almost zero w.c. and the temperature dropped to 43 degrees F." Dkt. No. 59-20 at ¶ 3.  Bollana called Mejia to advise him of the collapse.  Dkt. No. 60-3 at ¶ 119.

### E.  Damage to the Dome

John Callahan, executive general adjuster with Travelers Indemnity Company, the parent company of Charter Oak Fire Insurance Company, issued payments to Utica College for property damage totaling $3,434,276.34.  Dkt. No. 68-5 at ¶¶ 120-21.  Damage payments were made in several different categories, including damage to the Utica Dome calculated at the replacement

cost value of $1,541,366.18,[23] and damage to Utica College's "other property"[24] and other expenses including debris removal, temporary fencing, and site protection of $1,892,910.16.  *Id.* at ¶¶ 122-23.

###    F.  Cause of the Dome Collapse

####       1.  Yeadon's Design of the Dome

Temco's expert engineer, David B. Peraza, opined that the Utica Dome "was not designed safely to support the snow loads prescribed by the governing [2010] New York State Building Code" (the "2010 Code" or "NYS BC-10"), and, on the day of the collapse, the snow load on the Dome was "slightly greater than the snow load the [D]ome was designed for."  Dkt. No. 59-15 at ¶¶ 4(a)-(b).  Peraza stated that Yeadon did not design the Utica Dome to support the snow load as outlined in the 2010 Code, but instead designed the Dome according to the "manual method of professional standard known as [American Society of Civil Engineers ("ASCE") 17-96 (1996)]" which was not adopted by the 2010 Code.  *Id.* at ¶¶ 4(b)-(c).  Peraza explained that the 2010 Code "does not allow a reduction in the design snow load that depends on manual snow removal.  Nor has the Code adopted the publication that was relied upon by Yeadon to reduce the snow load."  *Id.* at ¶ 4(b).  Peraza concluded that if the Utica Dome had been designed as required by the 2010 Code, it would not have collapsed.  *Id.* at ¶ 4(d).

Plaintiff's expert engineer, Ben Lavon, P.E., also opined that the Dome did not comply with the "applicable [2010] code for the design and construction of the Utica College [D]ome"

---

[23] The replacement cost value "include[s] the cost of the fabric membrane, insulation, lighting, installation and wiring."  Dkt. No. 68-2 at ¶ 6.

[24] "Other property" includes artificial turf replacement valued at $272,730.73, track surface moisture barrier replacement valued at $159,100.00, and sporting equipment and personal property replacement valued at $522,362.86.  Dkt. No. 68-2 at ¶ 8.

despite Yeadon's design drawings indicating it complied with the 2010 Code, and instead was "based on some wrong assumptions of snow removal or snow melting as permitted by ASCE 17-96 (1996)." Dkt. No. 68-1 at ¶¶ 3(a)-(b), (d).[25]  Specifically, Lavon opined that "ASCE 7-05 (which is a Reference Standard in NYS BC-10) does not permit the reduction of design snow loads by means of melting or mechanically removing snow." *Id.* at ¶ 3(e).  Additionally, Lavon found that the Dome "lacked any secondary support structure as required under" the 2010 Code, and the Automated System "could not overcome the [D]ome's structural deficiencies." *Id.* at ¶¶ 3(m)-(n), 20.  Lavon concluded that the Dome could not support the weight of snow during storm Stella leading to its collapse. *Id.* at ¶ 3(b).  Lavon further concluded that if the Dome had been designed according to the "NYS BC-10 snow load requirements," the Dome would not have collapsed. *Id.* at ¶¶ 3(o)-(p), 18.

In contrast, Yeadon's expert engineer, David M. Campbell, P.E., opined that the Utica Dome was designed to the 2010 Code and "various reference standards, pertinent to the discussion that follows, ASCE 7-05, *Minimum Design Loads for Buildings and Other Structures*, 2005 edition, published by the American Society of Civil Engineers." Dkt. No. 67-1 at 7.  Campbell explained that the design snow loads were reliant on the "manual method" of snow removal, ASCE 17-96, and neither the 2010 Code nor ASCE 7-05 "explicitly address reduction of the design snow loads due to snow removal by any method." *Id.*[26]  Campbell also noted that the drawing AS-1

---

[25] Lavon's report stated that Yeadon's drawing AS-2 references both the 2010 Code and the ASCE 17-1996 Standard, but the ASCE 17-1996 Standard is not referenced by the 2010 Code, and is therefore inapplicable to the Dome's design. Dkt. No. 68-1 at 11, 17.  Lavon opined that the "snow design load used (5.33 [pounds per square foot ("psf")]) was substantially less than the load required by NYS BC-10 (60 psf), and substantially less than 24 [inches of] snow accumulation, estimated at approximately 28 psf, depending on snow density." Dkt. No. 68-1 at ¶ 3(d).

[26] Campbell noted that the Commentary in ASCE 7-05 cites to two reference standards which permit "the reduction of snow loads on air-supported roofs by manual removal as well as by snow melt or both.  The result is that it is ambiguous and arguable whether such reductions [in] design

clearly noted that the snow design load used was 5.33 psf.  *Id.* at 8.  Campbell further opined that Yeadon's engineer, Bradley C. Saalfeld P.E., "was satisfied that the Dome design met the Code as he sealed and signed the drawings," leaving the authority to the City of Utica to approve the drawings which it did "with no exceptions raised."  *Id.*

Campbell also opined that the "snow load on the crown of the [Dome] at the time of failure greatly exceeded the snow load threshold for snow removal identified" on the Dome's engineering drawings and the Owner's Manual provisions for snow load management.  Dkt. No. 67-1 at ¶ 3(A). Campbell stated that the Dome "was not intended to support the Code design snow load in its inflated state," and the Dome required "snow [to] be removed from the top center region (crown)" if it accumulates, to prevent potential damage and deflation.  *Id.* at ¶¶ 3(B)-(C).  Campbell concluded that Utica College and Temco failed to make any preparations prior to and on the day of the storm to monitor the Utica Dome for snow accumulation, remove snow on the crown of the Dome, or call Yeadon's hotline, which was contrary to the Owner's Manual and Yeadon's design drawings.  *Id.* at ¶¶ 3(D)-(I).[27]

### 2. Method of Snow Removal

Peraza, Temco's expert, opined that the methods that Yeadon outlines for snow removal from the top of the Dome cannot be reliably performed during a winter storm.  Dkt. No. 59-15 at ¶ 4(e).  Peraza explained that there was no safe access provided to the Utica Dome's roof, and it was not possible during storm Stella for custodians and technicians to "perform manual snow

---

snow loads are permitted for the design of air-supported roofs or domes per the 2010 [Code]." Dkt. No. 67-1 at 7-8.  However, Peraza notes that "[t]he Commentary cited by Yeadon is not part of the ASCE standard, and is not referenced by the Code."  Dkt. No. 74-1 at ¶ 13.

[27] Campbell's report also stated that given that "[t]he storm was quite severe, possibly there would have been a deflation in spite of good preparation and best efforts, but there was no doubt as to the outcome without any preparation or effort."  Dkt. No. 67-1 at 11.

removal reliably" on the Dome which was 82 feet tall and 250 feet wide.  *Id.* at ¶¶ 4(e)-(f).

Additionally, Lavon, Utica College's expert, noted that it would be impractical to remove snow

"using ropes from such an extremely large dome."  Dkt. No. 68-1 at ¶ 3(f).

In contrast, Campbell, Yeadon's expert, opined that the Owner's Manual is clear that

"snow must not be allowed to accumulate on top of the [D]ome and around the base," and for a

structure "covering 135,000 [square feet]," it requires "preparation, monitoring, equipment, and

personnel."  Dkt. No. 67-1 at 11.  Campbell further opined that Utica College's opinion that it was

impractical to use the Rope Method to remove snow from the crown of the Dome was "completely

academic" because Utica College and Temco failed to take any action to prepare for or remove the

snow that accumulated on the crown of the Utica Dome during the March 14th snowstorm.  Dkt.

No. 67-1 at ¶¶ 3(D)-(J), 11.

### 3.  Training on Removal of Snow from the Dome

Peraza opined that Yeadon failed to train personnel on the Rope Method of removing snow.

Dkt. No. 59-15 at ¶ 4(i).  Lavon also opined that Yeadon provided inadequate training for

protecting the Utica Dome during an emergency snowstorm,[28] and the Owner's Manual sent an

unclear message as to whether manual snow removal is required where the owner purchased an

automated system. Dkt. No. 68-1 at ¶ 3(j).  Lavon further opined that the Owner's Manual did not

clearly indicate that the failure to manually remove snow, or lack of action from an operator, could

---

[28] Lavon opined that "Yeadon was required to specifically train maintenance personnel to
mechanically remove the snow using ropes . . . if they were depending on this method.  There is
no record for such comprehensive training.  Also, there is no record of specific written procedures
by Yeadon to remove snow mechanically.  No ropes were used during training, nor were they
supplied with the [D]ome."  Dkt. No. 68-1 at ¶ 3(g).

lead to the Dome's collapse. *Id.* at ¶ 3(k).[29]

On the other hand, Campbell opined that the Owner's Manual clearly states "that snow must not be allowed to accumulate on the top of the Dome and . . . the actions to be taken to remove or clear snow includ[ed] manual removal" and that the General Notes highlight the necessity of having "personnel available to monitor and remove snow if snow is forecast." Dkt. No. 67-1 at 8.

### 4. The Dome Fabric

The "roof membrane of the [D]ome sustained a tear along its width, approximately 220 feet from its north end, as well as a tear in the north-to-south direction, approximately 115 feet from its west end." Dkt. No. 59-20 at ¶ 4. Peraza opined that the tears in the Dome membrane due to snow overloading caused or contributed to the collapse of the Dome. Dkt. No. 59-17 at 9.

In contrast, Campbell opined that the damage to the Dome fabric was a consequence of the "fabric contacting an interior sports net stanchion as a result of excessive snow accumulation on the crown of the [D]ome." Dkt. No. 67-1 at ¶ 3(J). Campbell further opined that such damage to the fabric "was avoidable if [] Utica College or its operators had followed" the Owner's Manual. *Id.*

Following the collapse of the Utica Dome, four fabric samples were taken by Seaman and tested for defects. Dkt. No. 60-3 at ¶¶ 7, 103; Dkt. No. 60-19 at ¶¶ 3-4. Andrew J. Shimko, who was employed at the relevant time by Seaman as Manager of Quality, Environmental and Technical Services, opined that there "were no manufacturing defects in the fabric material used for the construction of the [Dome]." Dkt. No. 60-3 at ¶ 104; Dkt. No. 60-19 at ¶¶ 1, 7.

---

[29] Lavon also noted that "Yeadon was aware of at least one prior collapse in Alaska which they believe took place because of the operator's failure to promptly remove snow." Dkt. No. 68-1 at ¶ 3(l).

### III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).  "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Galeotti v. Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted).  To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002).  A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997).  The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative

or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV.   DISCUSSION

### A.   Yeadon's Motion

Yeadon argues that it is entitled to summary judgment on Utica College's claims of negligence, strict products liability, breach of contract, and breach of warranty. *See generally* Dkt. No. 60-4. Where "jurisdiction is based upon diversity, the court must apply the substantive law of the forum state." *Rich v. Tee Bar Corp.*, No. 1:10-CV-1371 (MAD/CFH), 2013 WL 316154, at *4 (N.D.N.Y. Jan. 28, 2013) (citing *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)). Because this is a diversity action asserting common law claims, New York law applies. *See MasterCard Int'l Inc. v. Nike, Inc.*, 164 F. Supp. 3d 592, 604 (S.D.N.Y. 2016).

### 1.   Whether the Yeadon Contract Was For the Sale of Goods or Services

As an initial matter, the Court must determine whether New York's Uniform Commercial Code ("U.C.C.") applies to the Yeadon contract. The U.C.C. applies to contracts for the "sale of goods." *See* N.Y. U.C.C. Law § 2-106(1). The U.C.C. defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." N.Y. U.C.C. Law § 2-105(1). Further, an agreement "is subject to the U.C.C. if it is predominantly for the sale of goods." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 492 (S.D.N.Y. 2022) (internal quotation marks and citation omitted). On the other hand, the U.C.C.'s "provisions . . . are not applicable to either 'service' or 'construction' contracts." *Schenectady Steel Co. v. Bruno Trimpoli Gen. Const. Co.*, 43 A.D.2d 234, 236 (3d Dep't 1974) (citations omitted).

Where the contract involves both the sale of goods and the performance of services, "courts look to whether the alleged contract's primary purpose is to provide for the sale of such goods, or alternatively, whether service predominates, and the sale of such items is incidental." *Alessi Equip., Inc.*, 578 F. Supp. 3d at 492 (internal quotation marks, brackets and citations omitted); *see also KSW Mech. Servs. v. Johnson Controls, Inc.,* 992 F. Supp. 2d 135, 142 (E.D.N.Y. 2014) (finding "as a matter of law that the UCC applie[d] to [a] Purchase Order because it predominately involved a sale of goods and any services were incidental to that sale"). When it is "difficult to determine from the face of the agreement whether the sale of goods or the promise to provide service is predominant," the court may consider surrounding circumstances. *Those Certain Interested Underwriters, at Lloyd's, London, subscribing to Pol'y No. Z101663/003 v. Farley Grp.*, No. 1:12-CV-0707 (GTS/FRT), 2015 WL 5602924, at *41 (N.D.N.Y. Sept. 23, 2015) (internal quotation marks and citation omitted) ("*Underwriters*").

Yeadon argues that this Court should follow the analysis in *Underwriters*, in which this district found "that the sale and installation of an air-supported dome – nearly identical to the dome in question – was a sale of goods governed by the UCC." Dkt. No. 60-4 at 30 (citing *Underwriters*, 2015 WL 5602924, at *41-45).

The *Underwriters* court found that the dome at issue "was movable at the time of its identification to the contract" because the dome was considered a temporary structure for tax purposes, and deposition testimony indicated that plaintiff had procured estimates to move the dome to another location. *Underwriters*, 2015 WL 5602924, at *21, 41-44. The *Underwriters* court rejected the plaintiff's argument that the dome was not "movable" because "while the components making up the product may constitute goods, the fully assembled, finished product is not a good." *Id.* at *44 (citation omitted). The *Underwriters* court was persuaded by cases,

"applying identical provisions of the U.C.C.," which found that the U.C.C. governed contracts involving "seemingly permanent structures" that were either "a movable thing specifically manufactured" or movable at the time of the contract. *Id.* (citing, *inter alia*, *Robertson Co., Inc. v. Kenner,* 311 N.W.2d 194, 199-200 (N.D. 1981) (finding that a contract to build two galvanized steel buildings involved the sale of goods because the storage facilities "upon full assembly [were] capable of being detached from their foundations and [were] thus 'movable'"); *Kline Iron & Steel Co., v. Gray Commc'n Consultants, Inc.,* 715 F. Supp. 135 & n. 2 (D.S.C. 1989) (finding that the erection of a TV tower was a sale of "goods" because the various products to be manufactured or ordered "would clearly be movable at the time of identification of the contract"); and *Gruet v. Care Free Hous. Div. of Kenn–Sch. Enter.,* 305 A.D.2d 1060 (4th Dep't 2003) (finding that the "sale and delivery of a modular home is essentially a contract for the sale of goods governed by UCC article 2")).

The *Underwriters* court next examined the parties' contract and found that it was "predominantly one for goods rather than services and/or construction":

> The contract called for [d]efendant to provide 'one Air Structure' according to the specifications agreed upon by the parties. Any services rendered by [d]efendant in connection with the erection of the dome, training of staff in its use and operation, connection to the grade beam, and connection of mechanical systems were ancillary to the purpose of the contract. Furthermore, it is undisputed that the parties never entered into a service agreement, nor was [d]efendant ever retained to perform routine maintenance, service or inspections of the dome. Rather, the day-to-day operation and maintenance of the dome and its mechanical support systems is wholly [plaintiff's] responsibility and has been since the time of its erection.

*Id.* at *44.

Here, the Court agrees with Yeadon that the Dome is a "good" and the Yeadon Contract is governed by the U.C.C. *See* Dkt. No. 60-2 (Mejia Affidavit noting that the Dome "is a temporary structure that can be taken down, moved and put back up as the owner desires"); Dkt. No. 60-10

at 111:8-11 (Bollana testifying that nobody from Yeadon represented that the Dome was a permanent structure).

Utica College asserts that the Dome is a permanent structure because it was connected to a "physical building," *see* Dkt. No. 68-5 at ¶ 102 and that "at no time did Utica [College] ever consider the [D]ome to be a temporary structure," *see* Dkt. No. 68-3 at ¶ 3 (Affidavit of Vice President of Financial Affairs, Pamela Salmon).  The Court finds, however, that Utica College has not presented evidence to rebut Yeadon's showing that the Dome was "movable at the time of identification of the contract," and capable of being moved to another location.  *See Underwriters*, 2015 WL 5602924, at *44; *see also* Dkt. No. 68 at 26 (Utica College admitted that the Dome was capable of a "controlled deflation").

The Court also disagrees with Utica College's argument that the Yeadon Contract was for services because its "primary objective . . . was the construction of [the] Dome, [a permanent structure and] not the sale of its component parts."  Dkt. No. 68 at 27.  Here, as in *Underwriters*, Yeadon agreed to supply one "Yeadon Air Structure approximately 270' wide x 500' long x 81' high" and to provide "necessary calculations and construction drawings" and component parts. Dkt. No. 60-20 at 1-5.  There is no service agreement between Yeadon and Utica College, and Utica College hired Temco to "monitor, maintain and control" the Utica Dome.  *See* Dkt. No. 60-3 at ¶ 96; Dkt. No. 60-4 at 31.  While Yeadon provided some services, including training on operation of the Dome, these services were only ancillary to the main purpose of the contract—to supply the Dome.  *See Underwriters*, 2015 WL 5602924, at *44; *see also KSW Mech. Servs.*, *v. Johnson Controls, Inc.,* 992 F. Supp. 2d at 141 ("Contracts for goods which involve—incident to the sale of goods—services such as installation, maintenance, testing, instruction or supervision are still subject to the UCC"); *Word Mgmt. Corp. v. AT & T Info. Sys.*, 135 A.D.2d 317, 321 (3d

Dep't 1988) (finding that although "some service was involved" in the contract, the contract was one for a system sold to plaintiff to perform data transmitting functions).  Accordingly, the Court finds that the Yeadon Contract was for the sale of a "good" and the U.C.C. governs.

### 2.  Contract Claims

#### a.  Limited Liability Provision

Yeadon argues that the limitation of liability provision in the Yeadon Contract, *see* Dkt. No. 60-20 at 7, precludes Plaintiff from recovering consequential economic damages.  Dkt. No. 60-4 at 16-19; *see also* Dkt. No. 2 at ¶ 23 (alleging that Yeadon's acts and/or omissions caused "incidental and consequential losses"); Dkt. No. 60-26 at 5-6 (Utica College's response to Yeadon's interrogatories assert that Utica College's damages include "Business Interruption/Extra Expense").

Under N.Y. U.C.C. Law § 2-719, "parties to a commercial contract may agree to limit the seller's liability for damages" as long as the limitation is not unconscionable.  *Radiology & Imaging Specialists of Lakeland, P.A. v. FUJIFILM Med. Sys., U.S.A., Inc*., No. 20 CIV. 4117 (AKH), 2021 WL 149027, at *3 (S.D.N.Y. Jan. 15, 2021) (citing N.Y. U.C.C. Law § 2-719(3)) ("Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable.").  "Determining unconscionability is a question of law."  *President Container Grp. II, LLC v. Systec Corp*., 467 F. Supp. 3d 158, 170 (S.D.N.Y. 2020) (citing *McNally Wellman Co., a Div. of Boliden Allis v. New York State Elec. & Gas Corp*., 63 F.3d 1188, 1198 (2d Cir. 1995) (collecting cases)).

An "unconscionable contract is one that is so grossly unreasonable in the light of the mores and business practices of the time and place as to be unenforceable on its face."  *Radiology & Imaging Specialists of Lakeland, P.A.*, 2021 WL 149027, at *3 (internal quotation marks and

citation omitted).[30]  Here, the limitation of liability provision in the Yeadon Contract provides, in relevant part, that Yeadon "shall not be liable in contract or in tort (including negligence) for loss of profits or revenue . . . or for any special, indirect, incidental or consequential damages of any nature resulting from or in any manner relating to the air-supported structure."  Dkt. No. 60-20 at 7.

Yeadon argues that there is no evidence that the Yeadon Contract was procedurally or substantively unconscionable as "the contract was [not] entered into under any duress or coercion," Utica College did not object or raise concerns regarding the Yeadon Contract, the limited liability provision "is sufficiently conspicuous" on a separate page with bold capital letters, and the exclusion of consequential damages was not unreasonably favorable to Yeadon.  Dkt. No. 60-4 at 18-19; *see Underwriters*, 2015 WL 5602924, at *39-40 (finding defendant's almost identical limitation-of-liability provision was not unconscionable because, *inter alia*, the provision used bold capitalized letters, the provision was not unreasonably favorable to the defendant, and there was no evidence that the defendant "exerted pressure" on the plaintiff to sign the contract or agree to its terms).  Because Utica College did not argue that the Yeadon Contract was unconscionable in its Opposition, the Court deems this argument unopposed.  *See generally* Dkt. No. 68; *see also Chacko v. Costco Wholesale Corp*., 568 F. Supp. 3d 487, 499 (S.D.N.Y. 2021) (finding an argument unopposed when a party's "opposition brief ma[de] no reference to [the] argument").

Accordingly, Utica College is precluded from recovering consequential economic damages.

---

[30] A "court generally requires a showing that the contract was both procedurally and substantively unconscionable when made—*i.e.,* some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *President Container Grp. II, LLC*, 467 F. Supp. 3d at 170 (internal quotation marks and citation omitted).

###### b. Breach of Warranty

Yeadon argues that it is entitled to summary judgement on Utica College's breach of warranty claim because the Yeadon Contract does not provide a "warranty as to the [D]ome's ability to withstand snow loads." Dkt. No. 60-4 at 11. Yeadon contends that other than a limited warranty concerning the Dome fabric, which was not breached, the Yeadon Contract expressly excluded any warranties, including "any implied warranties of merchantability or fitness for a particular purpose." Dkt. No. 60-4 at 6, 9-11. Yeadon further argues that the Dome was "fit for its intended purpose[] had Plaintiff followed instructions and exercised any level of responsibility." *Id.* at 10-11. In response, Utica College does not address the exclusion of express warranties in the Yeadon Contract, but argues as to breach of an implied warranty of merchantability, that there is a question of fact as to whether the Dome was fit for its intended purpose "when used in the customary, usual, and reasonably foreseeable manner" because the College was looking for a "permanent [D]ome that would survive the winter without collapsing during the snow." Dkt. No. 68 at 29.[31]

"Implied warranties include the implied warranty of merchantability and the implied warranty of fitness for a particular purpose." *Brownell v. Starbucks Coffee Co.,* No. 5:22-CV-1199 (FJS) (ATB), 2023 WL 4489494, at *6 (N.D.N.Y. July 12, 2023) (internal quotation marks and citations omitted). In New York, an implied warranty of merchantability is governed by Section 2-314 of the U.C.C. which provides that "a warranty that the goods shall be merchantable

---

[31] Because Utica College's Opposition did not make any reference to Yeadon's exclusion of express warranties in the Yeadon Contract, *see generally* Dkt. No 68, the Court deems that argument unopposed, *see Chacko*, 568 F. Supp. 3d at 499.

is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Jackson v. Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523, 530 (E.D.N.Y. 2012) (quoting N.Y. U.C.C. Law § 2–314(1)). The U.C.C. also "provides that to be merchantable, the goods must be: (1) fit for the ordinary purpose for which they are used; (2) capable of passing without objection in the trade under the contract description; and (3) of fair and average quality for such goods." *Id.* at 530-31 (citing N.Y. U.C.C. Law § 2–314(2)).

The U.C.C. "generally permits disclaimers of warranties that are adequately clear and conspicuous." *Catalano v. MarineMax,* 590 F. Supp. 3d 487, 502 (E.D.N.Y. 2022) (internal quotation marks and citations omitted). "Section 2-316 sets forth the standard for the exclusion of implied warranties under the New York U.C.C. To exclude an implied warranty of merchantability, a contract's disclaimer 'must mention merchantability and in case of a writing must be conspicuous.'" *NY Drilling, Inc. v. TJM, Inc. LLC*, 573 F. Supp. 3d 854, 858 (E.D.N.Y. 2021) (quoting N.Y. U.C.C. Law § 2-316(2)). Similarly, "an exclusion of the implied warranty of fitness [for a particular purpose] 'must be by a writing and conspicuous.'" *Id.* (quoting N.Y. U.C.C. Law § 2-316(2)). The U.C.C. provides that a term is conspicuous if "written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision for the court." N.Y. U.C.C. Law § 1-201(10).

Here, the Yeadon Contract expressly excluded, in capital letters, "the fabric, motors, blowers, emergency generators, heating and air conditioning units, controls, thermostats, lighting fixtures, structural cables and protective screens, netting or any other items or equipment used or supplied for the air-supported structure and limited to the warranty provided by the manufacturer of the aforementioned fabric and equipment, in lieu of any other warranty, express or implied." Dkt. No. 60-3 at ¶ 9. Moreover, in capital letters, the Yeadon Contract stated "except for the

express warranty herein, there are no other warranties, including any implied warranties of merchantability or fitness for purpose applicable to the air-supported structure." *Id*. at ¶ 11.

The Court finds that the clear and conspicuous language in the Yeadon Contract was sufficient to disclaim any implied warranties. *See, e.g., NY Drilling, Inc*., 573 F. Supp. 3d at 859-61 (finding that a disclaimer of warranties was valid where the text was "in all capital letters and . . . clearly and explicitly disclaim[ed] the warranties of fitness and merchantability," and where the disclaimer was "set off in its own discrete paragraph, in a font and type size that differ[ed] from the text surrounding it"); *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 200 (E.D.N.Y. 2010) (dismissing plaintiff's breach of warranty claim because the disclaimer "[wa]s in capital letters in a separate block paragraph and specifically mention[ed] merchantability . . . [and] fitness").[32]  Accordingly, the Court finds that Yeadon is entitled to summary judgment on Utica College's breach of warranty claim.

### c.   Breach of Contract

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'"  *Orlander v. Staples, Inc*., 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  When interpreting a contract, the court "must 'give a fair and reasonable meaning to the language used.'" *Access Bus. Grp. Int'l, LLC v. Refresco Beverages US Inc*., No. 21-CV-10779 (AS), 2023 WL

---

[32] Even if a disclaimer is proper, the U.C.C. "provides that a court may void such a clause if it finds it 'to have been unconscionable at the time it was made.'" *Shema Kolainu-Hear Our Voices*, 832 F. Supp. 2d at 200 (quoting N.Y. U.C.C. Law § 2–302).  As addressed above, *see supra* § IV(A)(2)(a), the Court finds the disclaimer here is not unconscionable.

6977392, at *2 (S.D.N.Y. Oct. 23, 2023) (quoting *Hughes Commc'ns India Priv. Ltd. v. The DirecTV Grp., Inc.*, 71 F.4th 141, 153 (2d Cir. 2023) (applying New York law)).

Yeadon argues that it is entitled to summary judgment on Utica College's breach of contract claim because its contractual duties "were to manufacture and install the Dome," and "Yeadon fulfilled all of its obligation under the [Yeadon Contract] by providing Utica College with a merchantable dome that was fit for its intended purpose." Dkt. No. 60-4 at 31. Yeadon contends that it did not have an obligation to "perform routine maintenance, service or inspection" of the Dome and "no defects were found in the tested samples of fabric." *Id.*; Dkt. No. 71 at 9. Therefore, Yeadon claims it fulfilled its obligations under the contract once Utica College received the Handover Certificate with the Certificate of Occupancy. Dkt. No. 71 at 9. Utica College responds that the Yeadon Contract states that "Yeadon will provide necessary calculations and construction location drawings," *see* Dkt. No. 60-20 at ¶ 22, and there is a question of material fact as to whether Yeadon "breached the contract to provide necessary calculations that properly followed [the 2010 Code]" which would have allowed the Dome to withstand a heavy snowfall. Dkt. No. 68 at 28-29; *see also* Dkt. No. 68-1 at 11, 19 (Lavon's report noted that the Yeadon Contract "appendix includes drawing AS-2, which references [the 2010 Code] (NYS BC-10)" and the "snow design load [Yeadon] used (5.33 psf) was substantially less than the load required by NYS BC-10 (60 psf)").

The Court finds, viewing the evidence in the light most favorable to Utica College, that there is a question of material fact as to whether Yeadon breached the contract by failing to provide "necessary calculations and construction location drawings." *See* Dkt. No. 60-20 at ¶ 22. Campbell, Yeadon's expert, opined that the Dome complied with the 2010 Code, as neither the 2010 Code nor ASCE 7-05, a reference standard in the 2010 Code, "explicitly address reduction

of the design snow loads due to snow removal by any method." Dkt. No. 67-1 at 7. On the other hand, Temco's and Utica College's experts, Peraza and Lavon, opined that the Dome was not designed to safely support the snow loads under the 2010 Code, and if the Dome had complied with the 2010 Code, it would not have collapsed. Dkt. No. 59-15 at ¶¶ 4(a)-(d); Dkt. No. 68-1 at ¶¶ 3(a)-(b), (d)-(e), (o)-(p). Accordingly, Yeadon's Motion as to Utica College's breach of contract claim is denied.[33]

### 3. Whether the Economic Loss Rule Precludes Plaintiff's Tort Remedies

The parties dispute whether Plaintiff is entitled to seek remedies in tort for the collapse of the Dome or whether it is limited to whatever remedies are provided for in the Yeadon Contract. *Compare* Dkt. Nos. 60-4 at 12-16, 71 at 12-13 *with* Dkt. No. 68 at 13-21. "The economic loss rule 'provides that where only economic loss with respect to a product itself is alleged and the underlying transaction is a sale of goods, the purchaser is limited to its contractual remedies and may not maintain the traditional tort causes of action of negligence or strict products liability.'" *Moore v. Madison Reed, Inc.*, No. 1:22-CV-115 (GLS) (DJS), 2023 WL 5097966, at *8 (N.D.N.Y.

---

[33] The Court notes that "[u]nder New York law, disclaimers of warranties . . . bar contract claims based on the alleged breach of those warranties." *Ham v. Lenovo (United States) Inc*., 664 F. Supp. 3d 562, 583 (S.D.N.Y. 2023) (internal quotation marks and citation omitted). Here, the contract provision to provide "necessary calculations and construction location drawings," is separate from the warranties in the Yeadon Contract, which do not directly address whether the Dome complied with the 2010 Code. *See, e.g., Word Mgmt. Corp.*, 135 A.D.2d at 319 (finding plaintiff's breach of contract claim that "equipment did not operate properly" survived summary judgment while plaintiff's breach of implied warranty claim was dismissed under N.Y. U.C.C. Law § 2–316); *Tiffany at Westbury Condo. By Its Bd. of Managers v. Marelli Dev. Corp.,* 40 A.D.3d 1073, 1076 (2d Dep't 2007) (noting that because the offering plan and purchase agreements "contained specific provisions as to how [the condominium] would be constructed, which are separate and apart from the limited warranty, the owners [were] entitled to assert common-law breach of contract causes of action with respect to those provisions"); *110 Cent. Park S. Corp. v. 112 Cent. Park S., LLC,* 970 N.Y.S.2d 681, 687 (Sup. Ct. N.Y. Cnty. 2013) ("Claims that a builder failed to build a new building according to the specifications in the contract are separate from warranty claims.").

Aug. 9, 2023) (quoting *Cincinnati Ins. Co. v. Emerson Climate Techs., Inc.*, 215 A.D.3d 1098, 1100 (3d Dep't 2023)).  The "rule is applicable to economic losses to the product itself as well as consequential damages resulting from the defect."  *Underwriters*, 2015 WL 5602924, at *30 (internal quotation marks and citation omitted).  The purpose "behind the economic loss doctrine is that economic losses resulting from a defective product are best treated under the law of contracts, not tort."  *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 367 (E.D.N.Y. 2022) (internal quotation marks and citation omitted).  A "court determining whether the economic loss doctrine applies should consider the nature of the defect, the manner in which the injury occurred, and the damages sought."  *Underwriters*, 2015 WL 5602924, at *30 (internal quotation marks and citations omitted).

Yeadon argues that Utica College's negligence and strict liability claims fail because they are barred by the economic loss rule, and no exceptions apply.  Dkt. No. 60-4 at 12-16; Dkt. No. 71 at 12-13.  Utica College responds that the economic loss rule is inapplicable because: (1) its losses occurred from "an abrupt cataclysmic occurrence" which "mitigates strongly in favor of a finding of tort liability"; (2) Utica College is seeking to recover damages for "other property," not just the Dome itself; (3) Yeadon breached a professional duty of care to Utica College that is independent from its contractual duties; and (4) Utica College has stated claims for negligent misrepresentation, failure to warn, and defective design and construction of the Dome, that are independent from its contract with Yeadon.  Dkt. No. 68 at 7-24.  The Court will discuss each in turn.

### a.  An Abrupt Cataclysmic Occurrence

Plaintiff argues that a defect in the design of the Dome which prevented the Dome from shedding or being able to withstand snow, "caused a sudden, accidental, and cataclysmic event"

resulting in "catastrophic consequences" and, as a result, recovery in tort should be permitted.  Dkt. No. 68 at 14-17.  While an "abrupt cataclysmic occurrence" may be a relevant factor to determine whether the economic loss rule applies, courts have consistently found that "in and of itself, [it] is insufficient to operate as an exception to the economic loss rule."  *See Underwriters*, 2015 WL 5602924, at *31 (citing *Wade v. Tiffin Motorhomes*, *Inc.*, 686 F. Supp. 2d 174, 187-88 (N.D.N.Y. 2009)); *see also Hartford Fire Ins. Co. v. Atl. Handling Sys., LLC*, No. 09-CV-4127 (RRM) (ALC), 2011 WL 4463338, at *9 (E.D.N.Y. Sept. 26, 2011) (noting that damages resulting from an "abrupt, cataclysmic occurrence" should not be treated as "dispositive" or "sufficient" to establish a "tort duty independent of the contract") (collecting cases).

In *E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986), the Supreme Court found that when the loss to a product is purely economic, "[e]ven when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law."  *Id.* at 870.  In *Wade,* the court found that while "language in some New York State Appellate Division cases indicating that the abruptness of an event may be a relevant factor in determining whether the economic loss doctrine applies," the court was "not persuaded by [p]laintiffs' reliance on the abrupt nature of the fire [to a recreational vehicle] in arguing that the economic loss rule does not apply."  686 F. Supp. 2d at 188.  Here, although the Dome suffered a sudden collapse that resulted in substantial property damage and could have led to serious injuries, *see* Dkt. No. 68 at 14, 16, that is not determinative as to whether the economic loss rule applies.  *See Underwriters*, 2015 WL 5602924, at *31 (finding that while the collapse of that dome was capable of producing "catastrophic consequences," this was only "one factor to consider").  The Court therefore finds that the nature of the collapse of the

Dome, by itself, is not sufficient to create an exception to the economic loss rule.

### b.  Recovery for Damages to "Other Property"

Utica College argues that "[e]ven if it were applied, the economic loss rule would still not bar recovery in tort for the additional significant damage to the 'other property,' contained within the Utica Dome," including "sports equipment, artificial turf replacement, track surface moisture barrier replacement" and other expenses.  Dkt. No. 68-2 at ¶ 8; Dkt. No. 68 at 17-18.  Under "New York State law, parties may recover in tort for damage to property other than the property that is the subject of a negligence or tort claim."  *Great Lakes Cheese of New York, Inc. v. Agri-Mark, Inc.,* No. 7:14-CV-0232 (GTS) (ATB), 2016 WL 5717337, at *11 (N.D.N.Y. Sept. 30, 2016) (collecting cases); *see also Wade,* 686 F. Supp. 2d at 188 (noting that district courts in the Second Circuit applying New York law have "made clear that, when a product causes damage not only to itself, but to 'other property,' tort liability is 'generally present.'") (collecting cases).

In *Underwriters*, the court found that the economic loss rule precluded the recovery of roof panels and light ballasts which were "attached to the dome's ceiling" and considered part of the dome itself.  2015 WL 5602924, at *32; *see also Trump Int'l Hotel & Tower v. Carrier Corp.,* 524 F. Supp. 2d 302, 309 (S.D.N.Y. 2009) (holding that component parts to the product and the product itself are one integrated unit).  However, the *Underwriters* court also found that the economic loss rule did not preclude recovery of the turf field because the parties did not contract to supply a turf field and the field was "not affixed to the dome or otherwise integral to the dome's functioning." *Underwriters*, 2015 WL 5602924, at *32.

Here, the "other property" for which Utica College seeks recovery in tort, i.e., artificial turf, sports equipment, track surface moisture barrier, and other expenses, including debris removal, temporary fencing, and site protection, also falls outside the Yeadon Contract.  *See* Dkt.

33

No. 60-20; *see also 126 Newton St., LLC v. Allbrand Com. Windows & Doors, Inc.,* 121 A.D.3d 651, 653 (2d Dep't 2014) (finding that "other property" was "not the subject of the parties' agreement").  Similar to the turf field in *Underwriters*, the "other property" here is separate from the Dome structure itself and not integral to the Dome's functioning.  *See Wade,* 686 F. Supp. 2d at 189 (finding that "the property inside of the motor home is property separate and apart from the motor home"); *see also Goldrich v. Masco Corp.,* No. 22-CV-3769 (KMK), 2023 WL 2649049, at *8 (S.D.N.Y. Mar. 27, 2023) (noting that the economic loss rule would not apply to the "costly plumbing work and replacement of tiles" due to the defective pool).

Utica College further argues that Yeadon's automated system was an extra feature, separate from the Yeadon Contract, for which Utica College paid approximately $15,000-30,0000, and as such, all of the damages, including the damage to the Dome, should qualify as "other property."  Dkt. No. 68 at 18-19.  The Court disagrees.  Although the automated system was an add-on feature, it was an integrated part of the Dome, and not, as Utica College contends, a physically distinct and separate feature, *see* Dkt. No. 68 at 19.  The Yeadon Contract included an "Automation Package," *see* Dkt. No. 60-20 at ¶ 8, and the Automation Package was integrated to the Dome, including controlling the Dome's temperature and pressure, and remotely monitoring the Dome.  *See* Dkt. No. 60-3 at ¶¶ 5, 45, 47, 111; Dkt. No. 68-5 at ¶ 130; *see also Saratoga Fishing Co. v. J.M. Martinac & Co.,* 520 U.S. 875, 879 (1997) (holding that the product at issue was the entire ship, not just the hydraulic system); *Rochester-Genesee Reg'l Trans. Auth. v. Cummins Inc.*, No. 09-CV-6370, 2010 WL 2998768, at *9 (W.D.N.Y. July 28, 2010) (finding that defective engines installed in buses did not constitute "other property" because the "buses and engines were integrated units").

Finally, Yeadon argues that even if the economic loss rule does not apply to "other property," there is no question for the jury as to whether Yeadon bears the cost of such "other property" because Utica College and/or Temco did not remove sharp objects or attempt manual snow removal prior to the Dome's collapse. Dkt. No. 71 at 12. The Court disagrees. Utica College has raised issues of material fact as to whether Yeadon designed the Dome to safely support snow loads, whether Yeadon properly trained Temco on the manual method of snow removal, whether Yeadon clearly communicated that manual snow removal was required during a snowstorm, and whether Yeadon's method of manual snow removal could be reliably performed during heavy snow. *See* Dkt. No. 59-15 at ¶ 4; Dkt. No. 68-1 at ¶ 3; *see also infra* § IV(3)(e), (f ).

Accordingly, the Court finds that the economic loss rule does not bar Utica College's negligence and strict liability claims related to the "other property," *see* Dkt. No. 68-2 at ¶ 8.

### c.  Independent Duty of Care

Utica College argues that Yeadon failed in its independent duty to comply with the 2010 Code in its design and construction of the Utica Dome. Dkt. No. 68 at 20-21. New York courts also "recognize an exception to the economic loss rule 'where the defendant has a duty independent of' its contractual obligations." *Great Lakes Cheese of New York*, *Inc.*, 2016 WL 5717337, at *12 (quoting *Rochester-Genesee Regional Trans. Auth.*, 2010 WL 2998768, at *8). The "legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987) (citation omitted). However, "merely alleging that the breach of a contract duty arose from a lack of due care will not transform a simple breach of contract into a tort." *Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 551 (1992) (citations omitted).

"New York courts have found that a contractor owes a common law tort duty to perform a contract non-negligently." *Underwriters*, 2015 WL 5602924, at \*35 (citing, *inter alia*, *Sommer*, 79 N.Y.2d at 552-53 (finding that a fire alarm company owed an independent duty to plaintiffs where its fire alarm failed to transmit a signal to the fire department and caused a delayed response to a building fire)). However, courts have also found that "this duty only applies to the 'limited class of cases in which a strong public interest in the careful performance of particular contractual obligations may give rise to a tort duty of due care.'" *Underwriters*, 2015 WL 5602924, at \*36 (quoting *Pfizer, Inc. v. Stryker Corp.*, 02–CV–8613, 2003 WL 21660339, at \*2 (S.D.N.Y. July 15, 2003), and collecting cases).

For example, courts have found an independent duty of care in highly regulated industries where a breach of duty could substantially affect public safety. *See, e.g., Great Lakes Cheese of New York, Inc.*, 2016 WL 5717337, at \*12 (finding an independent duty of care existed in a "highly regulated industry" as the "failure to properly handle and transport milk resulted in its alleged contamination as well as the contamination of other milk," was not "solely financial," and "implicate[d] consumer safety with respect to widely available products"); *RLI Ins. Co. v. King Sha Grp.*, 598 F. Supp. 2d 438, 445 (S.D.N.Y. 2009) (concluding, in the context of a service agreement, that the New York City Administrative Code created "an independent legal duty to perform construction work in accordance with Code specifications"); *Sommer*, 79 N.Y.2d at 552 (noting that the defendant alarm company was "franchised and regulated" by New York City to oversee the alarm system of a forty-two story building, and report to the fire department as part of the city's "comprehensive scheme of fire-safety regulations"); *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicecenter of Haverstraw, Inc.*, No. 02 CIV. 0504 (RCC), 2005 WL 550940, at \*3 (S.D.N.Y. Mar. 9, 2005), *amended,* 2006 WL 59770 (finding that a sublessee owed an

independent duty from the sublease to comply with the New York State Uniform Fire Prevention and Building Code and Occupational Safety and Health Act regulations).

Here, while the construction of the Dome must comply with the New York State Building Code, the construction and operation of air-supported domes is not part of a "highly regulated" industry. *See Hartford Fire Ins. Co.*, 2011 WL 4463338, at *7-8 (finding that defendants did not owe an independent duty of care to plaintiff because their duty was to supply and install a racking system, a result of private dealings "not because law or regulation required it"); *Vigilant Ins. Co. v. ADT Sec. Servs., Inc.,* No. 10–CV–3066, 2011 WL 855874, at *3 (S.D.N.Y. Mar. 9, 2011) (concluding that an alarm company did not owe an independent duty of care because, unlike the fire alarm company in *Sommer,* it was not "franchised and regulated" by New York City); *Verizon New York, Inc. v. Optical Commc'ns Grp., Inc.*, 91 A.D. 3d. 176, 182 (1st Dep't 2011) (noting that, by itself, "the public's interest in compliance with a statutory and regulatory scheme is not sufficient to create tort liability").

Courts have also found an independent duty of care where the underlying contract related to the provision of services, and the defendant's duties "puts the safety of a significant segment of the population in the hands of a contracting party." *Hartford Fire Ins. Co.*, 2011 WL 4463338, at *8; *see also Sommer*, 79 N.Y.2d at 552-53 ("[F]ailure to perform the [fire alarm relay] service carefully and competently can have catastrophic consequences."); *Trustees of Columbia Univ. v. Gwathmey Siegel & Assoc. Architects,* 192 A.D.2d 151, 154-55 (1st Dept 1993) (finding an independent duty when the faulty construction of student housing, which led to chunks of facade falling off a building into a "heavily trafficked public area of a college campus," presented a public safety concern warranting the imposition of tort liability); *Syracuse Cablesystems, Inc. v. Niagara Mohawk Power Co.,* 173 A.D.2d 138, 142 (4th Dep't 1991) (finding that Niagara Mohawk had an

independent duty of care to protect plaintiffs where the negligent operation of a power transformer led to an explosion and PCB contamination); *Vitolo v. Mentor H/S, Inc*., 426 F. Supp. 2d 28, 35-36 (E.D.N.Y. 2006) (stating that "imposition of an independent duty of care in an arms-length business transaction is reserved for the most serious of situations directly affecting the public at large").

However, courts have declined to find an independent duty of care when the plaintiff was seeking the benefit of its contractual bargain. *See, e.g., Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 389 (finding that plaintiffs' allegation that defendant failed to exercise "due care" in designing a railroad project was "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract"); *Orlando v. Novurania of Am., Inc.,* 162 F. Supp. 2d 220, 224-25 (S.D.N.Y. 2001) (finding that plaintiff's allegation that defendant was negligent in the "design, construction, maintenance, repair and sale" of a boat did not "indicate that defendant violated any legal duty owed to the plaintiff other than that which was owed under the contract").

Here, although the Court is mindful of the consequences that could have occurred if the Dome had collapsed while the College was in session, Yeadon's duty to supply a Dome that could safely withstand snow loads arises from a contract for goods in which Yeadon agreed, *inter alia*, to provide "necessary calculations and construction related drawings" for the Dome.  Dkt. No. 60-20.  *See Underwriters*, 2015 WL 5602924, at *37 (finding that the "alleged deficiencies in the design of the dome, and/or materials that were used, arise from the contract and do not create a legal duty independent of the contract").  Moreover, Utica College is seeking the benefit of its contractual bargain with Yeadon—to recover losses sustained due to the collapse of the Dome. *See* Dkt. No. 2 at ¶¶ 2-3; *see also Trump Vill. Section 3, Inc. v. New York State Hous. Fin. Agency*,

307 A.D.2d 891, 897 (1st Dep't 2003) (noting that plaintiff was "seeking the benefit of its contractual bargain, namely, the cost of completing the defective repairs to the building's terraces" and the "mere potential for serious injury" was not enough to create an independent duty) (internal quotation marks and citations omitted).

Accordingly, the Court finds that a duty of care independent of the Yeadon Contract does not support an exception to the economic loss rule.

### d.  Negligent Misrepresentation

A further limited exception to New York's economic loss rule exists for a claim of negligent misrepresentation.  *See Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of New York*, 734 F. Supp. 2d 368, 379 (S.D.N.Y. 2010).  Under New York law, to state a claim for negligent misrepresentation, a plaintiff must allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *High Income Sec. Fund v. Cedar Realty Tr., Inc*., No. 22-CV-04031 (JMA) (JMW), 2023 WL 6214237, at *10 (E.D.N.Y. Sept. 25, 2023) (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc*., 227 F.3d 8, 20 (2d Cir. 2000)).

Yeadon argues that "any exception to the economic loss rule founded in the context of negligent misrepresentation is inapplicable" because Utica College did not assert a negligent misrepresentation claim against Yeadon in the Complaint and is "thus precluded from asserting such a claim at this late stage of litigation."  Dkt. No. 60-4 at 14.  Yeadon further argues that even if Plaintiff had set forth a negligent misrepresentation claim, there is "no evidence whatsoever

demonstrating [that] Yeadon made any representations to Utica College about the [D]ome's ability to withstand snow loads." *Id.* at 15.

Utica College responds that its claim for negligence includes negligent advice or misrepresentation, and that negligent misrepresentation is shown by its pleading Yeadon's failure to warn Utica College to properly maintain and monitor the Dome. *See* Dkt. No. 68 at 24 (citing Dkt. No. 2 at ¶¶ 14(j), (l)).  Utica College further contends that it has "repeatedly articulated" allegations related to a negligent advice or misrepresentation claim, including that Yeadon provided a "false sense of security" by selling the Dome with automated features, misrepresented the Dome's snow load and snow shedding capabilities while it was in "automated mode," and provided unclear instructions and training regarding whether the Dome required monitoring and manual snow removal during a snowstorm.  Dkt. No. 68 at 21-23.

Where a party's complaint fails to allege facts sufficient to plead a claim for negligent misrepresentation, courts will not consider a claim of negligence to include a claim of negligent misrepresentation.  *See Texas Liquids Holdings, LLC v. Key Bank Nat. Ass'n,* No. 05 CV 5070 (KMW), 2007 WL 950136, at *3 n.6 (S.D.N.Y. Mar. 27, 2007) (finding that because plaintiff's complaint only alleged that the defendant "was negligent, not that defendant made a negligent misrepresentation," the court would not consider a claim of negligent misrepresentation).  Here, Utica College only cites to a broad, general allegation in the Complaint and in its response to Yeadon's interrogatory, that Yeadon failed to warn it of the risk of collapse of the Dome if it did not properly maintain and monitor the Dome.  *See* Dkt. No. 2 at ¶¶ 14(j), (l); Dkt. No. 60-26 at 7-8.  This allegation alone is insufficient to allege the elements of a cause of action for negligent misrepresentation.  *See Fisher v. APP Pharms., LLC,* 783 F. Supp. 2d 424, 432 (S.D.N.Y. 2011) (finding that the complaint failed to allege negligent misrepresentation because it "lack[ed] any

allegations regarding which misrepresentations were made to the [p]laintiff or his doctors, and what was relied upon in connection with his decision to take heparin").[34]

Accordingly, the Court finds that because Utica College failed to adequately allege facts sufficient to plead a claim of negligent misrepresentation in the Complaint, the Court does not need to decide whether an issue of material fact exists as to any alleged negligent misrepresentation by Yeadon.  *See Southwick Clothing LLC v. GFT (USA) Corp.,* 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in [a plaintiff's] opposition papers [to a motion for summary judgment], and hence such new allegations and claims should not be considered in resolving the motion.").

### e.  Failure to Warn and Defective Instructions

Courts have found that the economic loss rule precludes tort recovery for a plaintiff's failure-to-warn claim.  *Goldrich*, 2023 WL 2649049, at *6, 8 (finding that plaintiff's cause of action for failure to warn was barred by the economic loss rule); *see also Sea-Land Serv., Inc. v. Gen. Elec. Co.,* 134 F.3d 149, 156 (3d Cir. 1998) (finding that "a manufacturer may be culpable of a failure to warn, but if the damage is solely to the product itself and is solely economic, there

---

[34] Many district courts in the Second Circuit have stated that a negligent misrepresentation claim "'must be pled in accordance with the specificity criteria of [Fed. R. Civ. P.] 9(b)."  *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 294-95 (S.D.N.Y. 2023) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co*., 404 F.3d 566, 583 (2d Cir. 2005)); *see also HSM Holdings, LLC v. Mantu I.M. Mobile Ltd*., No. 20-CV-00967 (LJL), 2021 WL 918556, at *19 (S.D.N.Y. Mar. 10, 2021) (noting that while courts in the Second Circuit are "divided as to whether claims of negligent misrepresentation are always subject to a heightened pleading standard . . . [t]he majority of courts in this Circuit have applied the heightened pleading standard to all claims of negligent misrepresentation" and "[e]ven those courts that have expressed uncertainty as to whether the 9(b) heightened pleading standard applies in all instances have found it to apply when negligent misrepresentation claims sound in fraud").  However, the Court "does not need to resolve [whether Rule 9(b) applies] because even under the more lenient standards of Rule 8(a), Plaintiff's negligent misrepresentation claim cannot withstand the instant motion."  *See Fisher,* 783 F. Supp. 2d at 432.

is no tort recovery"); *accord Turbomeca, S.A. v. Era Helicopters LLC*, 536 F.3d 351, 357 (5th Cir. 2008); *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 WL 1570057, at *4 (S.D. Fla. May 2, 2012).

Utica College alleges that Yeadon failed to warn it how to properly maintain and monitor the Dome, of the dangers related to the use of the Dome, and how to prevent the Dome from collapse. Dkt. No. 2 at ¶¶ 14(j), (l), 22(b). To the extent Utica College alleges that Yeadon's failure to warn caused economic damages to the Dome itself, that claim is barred by the economic loss rule; however, Utica College's failure-to-warn claim regarding damages to its "other property" is not barred by the economic loss rule. *See Underwriters*, 2015 WL 5602924, at *38 (finding that the economic loss rule barred plaintiff's failure-to-warn claim as to the dome but allowed plaintiff to proceed with its failure-to-warn claim regarding damages associated with "other property"); *Goldrich*, 2023 WL 2649049, at *8 (noting that damages to other property would support a "tort cause of action," including for a failure to warn); *Mays Towing Co. v. Universal Mach. Co.,* 755 F. Supp. 830, 834 (S.D. Ill. 1990) (holding that plaintiff could proceed on its failure-to-warn claim "for those damages to property other than the [product itself]").

Yeadon, however, argues that it is entitled to summary judgment as to Utica College's failure-to-warn claim, because "the record clearly establishes that Utica College was advised in writing [through the] drawings and the Owner's Manual," and in-person during the training sessions, "that monitoring [the Dome] and manual snow removal were necessary in the event of a snowstorm." Dkt. No. 60-4 at 22-23. Yeadon further contends that any "alleged failure to advise or warn cannot be considered the proximate cause of the accident" because Utica College and Temco failed to follow the Owner's Manual, monitor the Dome after 3:30 p.m. on the day of the

collapse, attempt manual snow removal from the top of the Dome, or call the Yeadon Hotline. Dkt. No. 71 at 15-17.

In response, Utica College contends that there are triable issues of fact as to whether Yeadon failed to warn Utica College of the Dome's "actual minimum snow load capability" or that the Dome's automated system "would not properly shed snow," and, if it had received these warnings, the Dome may not have collapsed. Dkt. No. 68 at 28. Moreover, Utica College disputes whether Yeadon provided adequate training that manual snow removal was required in the event of a snowstorm or how to use the Rope Method. *See* Dkt. No. 68 at 12. Durant testified that he was never told to use the Rope Method during a snow event and Yeadon made Temco believe that using the automated system was sufficient during a snowstorm. Dkt. No. 60-15 at 46:3-11, 80:16-81:23; Dkt. No. 68-5 at ¶ 133. Additionally, Bollana testified that he was told the Dome was "fully automated" and that it "shouldn't need to go into manual mode." Dkt. No. 60-10 at 90:8-17.

"Under New York law, 'failure-to-warn claims grounded in strict liability and negligence are functionally equivalent.'" *Trask v. Carbon Prod., Inc.,* No. 1:18-CV-01130 (EAW), 2023 WL 4107967, at *9 (W.D.N.Y. June 21, 2023) (quoting *In re N.Y.C. Asbestos Litig.*, 27 N.Y.3d 765, 787 (2016)); *see also Underwriters*, 2015 WL 5602924, at *51 ("The elements of a failure-to-warn claim are the same as those of a strict liability claim and a negligence claim.") (citations omitted). To "prevail on a failure-to-warn claim, a plaintiff 'must show (1) that a manufacturer has a duty to warn; (2) against dangers resulting from foreseeable uses about which it knew or should have known; and (3) that failure to do so was the proximate cause of harm.'" *Sokolovic v. CVS Health*, No. 17-CV-6609 (RPK) (SJB), 2023 WL 2742148, at *13 (E.D.N.Y. Mar. 31, 2023) (quoting *Colon ex rel. Molina v. BIC USA, Inc*., 199 F. Supp. 2d 53, 84 (S.D.N.Y. 2001)); *see also Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998) (A "manufacturer has a duty to warn against latent

dangers resulting from foreseeable uses of its product of which it knew or should have known")
(citation omitted).

A duty to warn is breached "either by 'the complete absence of warnings as to a particular
hazard' or 'the inclusion of warnings which are insufficient.'" *Bah v. Nordson Corp.*, No. 00-
CIV-9060 (DAB), 2005 WL 1813023, at *13 (S.D.N.Y. Aug. 1, 2005) (quoting *Johnson v.
Johnson Chemical Co., Inc.*, 183 A.D.2d 64, 69 (2d Dep't 1992). "Under New York law, the jury
does not need expert testimony to find a warning inadequate, but may use its own judgment
concerning all the circumstances." *Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d 398, 413-14
(N.D.N.Y. 2012) (quoting *Billiar v. Minn. Mining and Mfg. Co.*, 623 F.2d 240, 247 (2d Cir. 1980));
*see also Underwriters*, 2015 WL 5602924, at *51 ("The adequacy of the instruction or warning is
generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic
remedy of summary judgment.") (internal quotation marks and citations omitted).  Additionally,
"a plaintiff does not have the burden, at the summary judgment stage, to show that an adequate
warning would have prevented [the] injury," and "a plaintiff's failure to read a warning is not
dispositive." *Underwriters*, 2015 WL 5602924, at *51 (citations omitted).

Here, Utica College received a warning through the Owner's Manual that manual snow
removal may be required during a snow event.  The Owner's Manual section, "Snow
Accumulation," advised Utica College that although the Dome was "designed to shed show," it is
possible for snow to accumulate on the top, along the perimeter base, and on door attachment
curtains, and when snow accumulates, Utica College must "take steps to manually remove the
snow immediately." Dkt. No. 60-18 at 9-10.  The Addendum to the Owner's Manual also provided
that snow accumulation on the top of the Dome must be visually inspected, using a laser measuring
device, and if "the dome deflects 3'6", the owner needs to perform manual snow removal to

dislodge the snow and allow it to shed off the top of the dome." Dkt. No. 60-3 at ¶¶ 40-41; Dkt. No. 60-18 at 11. As to the Automation System, the Owner's Manual provided that while "Automation systems can be relied on to adjust the [D]ome's pressure in non gusty conditions . . .[i]t is important to remember that this does not mean you can walk away from the [D]ome. . . . It is important to know that the automation system must not be used in gusty wind conditions for the wind sensor and in near freezing conditions for the snow sensor. The automation systems must be turned to manual in these conditions." Dkt. No. 60-3 at ¶ 44; Dkt. No. 60-18 at 24.

Additionally, the "General Notes" section of the AS-2 drawing stated that the Dome was designed to the "manual method," per the ASCE 17-96 (1996) standard. Dkt. No. 60-3 at ¶ 28. Finally, Mejia testified that Yeadon provided two in-person training sessions which included monitoring the Dome for snow accumulation, using the laser measuring devise if snow accumulates, and the Rope Method. Dkt. No. 60-4 at ¶¶ 61-62; Dkt. No. 60-12 at 194:4-18.

On the other hand, the Owner's Manual section on "Emergency Procedures" only advised Utica College that during heavy snow, the snow should be removed "around the perimeter as needed." Dkt. No. 60-18 at 17-18; *see also* Dkt. No. 68-1 at ¶¶ 3(j)-(k) (Plaintiff's expert, Lavon, opined that the Owner's Manual is "ambiguous and not clear" because "[d]uring an emergency snow storm the operator is told to remove snow from the perimeter but no mention of removal from the roof is made in this section, nor of manual snow removal being needed" and  the Manual did not "mention that failure to follow any procedures would lead to the collapse of the Dome").

As to proximate cause, the parties do not dispute that on the day of the Dome's collapse, Temco's maintenance department left at 3:30 p.m., the Dome was in snow mode and was never switched to manual mode, and snow removal from the top of the Dome was not attempted. Dkt. No. 60-3 at ¶¶ 74-76, 85; Dkt. No. 60-10 at 100:20-24; Dkt. No. 60-15 at 54:17-24. However,

these facts alone are insufficient to establish that there is not an issue of material fact as to Utica College's failure-to-warn claim. *See* Dkt. No. 68-1 at 11, 19 (Lavon's report points out that while the "general notes" portion of the drawing, AS-2, referenced manual snow removal, it also referenced the 2010 Code, and the snow design Yeadon used was less than the design required by the 2010 Code); Dkt. No. 67-1 at 11 (Campbell, Yeadon's expert, opines that "[t]he storm was quite severe, possibly there would have been a deflation in spite of good preparation and best efforts, but there was no doubt as to the outcome without any preparation or effort").[35]

The Court finds, construing the facts in the light most favorable to Utica College, that there are issues of material fact as to whether Yeadon failed to properly warn Utica College of the Dome's snow load capability, that the automated system could not be relied upon by itself to properly shed snow, and how to properly maintain and monitor the Dome to prevent it from collapsing during a snowstorm. *See, e.g., Henry v. Rehab Plus Inc*., 404 F. Supp. 2d 435, 442 (E.D.N.Y. 2005) (denying summary judgment on a failure-to-warn claim because while it was undisputed a training occurred, plaintiff "testified that he did not receive any such training" and therefore "it must be assumed that [plaintiff] did not have actual knowledge of the danger").[36] Accordingly, Yeadon's Motion is denied on the failure-to-warn claim as to the "other property."

---

[35] In its reply, Yeadon argues that Utica College's failure-to-warn claim should be decided as a matter of law because Utica College had knowledge of the weather conditions and "the hazard caused by snow build up is open and obvious expunging the need for [a] warning." Dkt. No. 71 at 15-16; *see Underwriters*, 2015 WL 5602924, at *51 (This "District has recognized two situations wherein failure-to-warn claims can be decided as a matter of law: '(1) where the injured party was fully aware of the hazard through general knowledge, observation or common sense; and (2) where the danger at issue falls within the limited class of hazards [that] need not be warned of as a matter of law because they are patently dangerous or pose open and obvious risks.'") (quoting *Rogers v. Westfalia Associated Techs., Inc.*, 485 F. Supp. 2d 121, 129 (N.D.N.Y. 2007)). The Court finds, construing the facts in the light most favorable to Utica College, that neither of these exceptions apply.

[36] The Court finds *Underwriters* to be distinguishable on the failure-to-warn claim. The *Underwriters* court found that there were no issues of material fact as to defendant's failure to

**f.  Defective Design and Construction of the Dome**[37]

Because the economic loss rule bars Utica College's negligence and strict liability claims related to the Dome itself, the Court will only consider Utica College's claim related to defective design and construction of the Dome regarding damages to its "other property."  *See Goldrich*, 2023 WL 2649049, at *6, 8 (finding plaintiff's cause of action for defective design as to the product itself was precluded by the economic loss rule); *Underwriters*, 2015 WL 5602924, at *41, 47-50 (analyzing whether there was an issue of material fact as to plaintiff's defective and/or negligent design claim as to "other property"); *Burnett v. Damon Corp.*, No. 5:10-CV-1336, 2013 WL 6230108, at *10 (N.D.N.Y. Dec. 2, 2013) (finding that the plaintiff who alleged "defects in the design and/or manufacture" of a recreational vehicle could seek damages for "other property").

Yeadon argues that the collapse of the Dome was not due to a design defect, and that the Dome's fabric, tested by Seaman, was not defective.  Dkt. No. 60-4 at 19-21; Dkt. No. 71 at 10-12.  Yeadon contends that the Dome was designed to shed snow, the drawings and Owner's Manual "clearly state[] that the design of the [D]ome incorporated manual snow removal," and the Dome's collapse was due to Utica College's and Temco's failure to follow "any of the instructions provided

---

warn because there was undisputed evidence that plaintiff's principal, Mr. Miller, was aware of the danger of snow accumulating on the top of the dome, including discussing snow accumulation with other dome owners and conducting research prior to purchasing the dome, and Mr. Miller observed snow accumulating on the dome weeks before the collapse and waited weeks to contact defendant.  *See* 2015 WL 5602924, at *51-52.

[37] Utica College alleges a design defect claim under theories of both negligence and strict liability. *See* Dkt. No. 2 at ¶¶ 14(e), 22(a), (e)-(j).  "In New York, [i]n a design defect case, there is almost no difference between a *prima facie* case in negligence and one in strict liability."  *Rogers*, 485 F. Supp. 2d at 126 (internal quotation marks and citation omitted).  Therefore, the Court will analyze the negligence and strict liability claims together.  *See Underwriters*, 2015 WL 5602924, at *47 n.8 (considering plaintiff's "negligence and strict liability design defect claims together"); *Maxwell v. Howmedica Osteonics Corp.,* 713 F. Supp. 2d 84, 90 n.8 (N.D.N.Y. 2010) (analyzing a design defect claim under both negligence and strict liability theories together).

to them."  Dkt. No. 60-4 at 5-6, 21.  Yeadon further argues that it hired THP "to confirm that the design plans complied with local New York State Regulations," and THP stamped the drawings which were submitted to the City of Utica Building Department.  Dkt. No. 71 at 10.  In Response, Utica College argues that Yeadon "failed to present any evidentiary support by way of expert proof that it supplied a Dome to conform to meet New York State Building Code requirements and that it was compliant with NYS BC-10."  Dkt. No. 68 at 11.

To prevail on a design defect claim under New York law, "a plaintiff must allege that '(1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing plaintiff's injury.'"  *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 403 (S.D.N.Y. 2013) (quoting *Colon*, 199 F. Supp. 2d at 83).  The first and second elements "are often combined and referred to as 'the risk-utility test.'"  *Rupolo v. Oshkosh Truck Corp.*, 749 F. Supp. 2d 31, 42 (E.D.N.Y. 2010) (citation omitted).

To establish liability under the risk-utility test, the following factors must be considered:

> (1) the product's utility to [the] public as a whole; (2) its utility to the individual user; (3) the likelihood that the product will cause injury; (4) the availability of a safer design; (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user; and (7) the manufacturer's ability to spread the cost of any safety-related design changes.

*Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-CV-3898 (RRM) (CLP), 2009 WL 3334364, at *5 (E.D.N.Y. Oct. 15, 2009) (quoting *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 257 (1995)).  "A plaintiff is not required to introduce proof on all of these factors, as relevance of each factor will vary from case to case, and the factors interact with one another."  *Guarascio v. Drake Assoc. Inc.*, 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008) (citation omitted).  As to the second element, a "plaintiff

must establish not only that a different design would have led to improved safety, but also that adopting such a design would be 'economically and technically feasible.'" *Cuntan,* 2009 WL 3334364, at *5 (quoting *Ruthosky v. John Deere Co.,* 235 A.D.2d 620, 622 (3d Dep't 1997)).  As to the third element, "the plaintiff is required to show that the defectively designed product caused his injury and that the defect was the proximate cause of the injury." *Rupolo*, 749 F. Supp. 2d at 42 (internal quotation marks and citations omitted).  "Usually, whether or not a defect was . . . a substantial factor is a matter for the trier of fact to decide." *Id.* (citation omitted).

"Generally, under New York law, a plaintiff seeking to establish a design defect is required to provide expert testimony as to the feasibility and efficacy of alternative designs." *Underwriters*, 2015 WL 5602924, at *48 (citing *Cuntan,* 2009 WL 3334364, at *6) (collecting cases).  Experts "can prove the feasibility and efficacy of alternative designs either by (1) showing, 'through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility,' or (2) identifying 'makers of similar equipment who have already put into use the alternative design.'" *Id.* (quoting *Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692 (S.D.N.Y. 2003)).  "Despite this standard, there is no specific evidence a plaintiff must submit." *Id.* (citations omitted).

Yeadon's architectural drawings were stamped by THP and submitted to the City of Utica Building Department prior to obtaining a permit.  Dkt. No. 60-3 at ¶¶ 16, 22, 24-25.  Drawing AS-2 contained "General Notes" which included that the Dome was designed to the "manual method" of snow removal.  Dkt. No. 60-3 at ¶ 28.  Additionally, a Certificate of Occupancy was issued to Utica College noting that there were "no visible defects at [t]ime of [i]nspection," *see* Dkt. No. 60-3 at ¶ 94; Dkt. No. 60-25 at 1, and the Chief Building Inspector for the City of Utica, Cozza,

testified that he inspected the Dome and would not have issued a Certificate of Occupancy if he believed the Dome was dangerous.  Dkt. No. 60-11 at 55:16-57:2.

Additionally, Yeadon's expert, Campbell, explained that neither the 2010 Code nor ASCE 7-05 "explicitly address reduction of the design snow loads due to snow removal by any method," and the commentary in ASCE 7-05 cites to two reference standards which permit reduction of snow loads on air-supported roofs by manual snow removal.  Dkt. No. 67-1 at 7-8.  Moreover, Campbell noted that the Owner's Manual is clear that "snow must not be allowed to accumulate on top of the [D]ome," and opined that its collapse was due to Utica College's and Temco's lack of preparation and action to prevent snow accumulation.  Dkt. No. 67-1 at 11.  Also, following the collapse of the Dome, Shimko, Seaman's Manager of Quality, Environmental and Technical Services, concluded that there "were no manufacturing defects in the fabric material used for the construction of the [Dome]."  Dkt. No. 60-3 at ¶ 104; Dkt. No. 60-19 at ¶¶ 1, 7.

On the other hand, Lavon pointed out that the drawing, AS-2, also referenced the 2010 Code which sets forth a much higher design load than what Yeadon used, and referenced ASCE 7-05 which does not permit reducing snow loads by melting or mechanically removing snow.  Dkt. No. 68-1 at ¶¶ 3(a), (e), 11.  Moreover, Cozza testified that Utica County Building Department inspectors do not calculate every engineering sketch and diagram, he relied on the submitting engineer's plan to make sure the Building Code was properly followed, and issuing a Certificate of Occupancy did not guarantee that the Dome "met [the] New York State [C]ode for structural stability."  Dkt. No. 60-11 at 16:11-17:5, 71:13-72:8; *see Clark v. Brownell*, 60 Misc. 3d 1227[A], 2018 WL 4102421, at *5 (Glens Falls City Ct. 2018) (noting that the issuance of a certificate of occupancy "is not conclusive evidence that the work conforms to the [design] plans"); *Curreri v New Town and Country Corp.*, 60 A.D. 3d 718, 720 (2d Dep't 2009) (noting the jury finding that

the defendant construction companies were negligent in the construction of stairs, despite the issuance of a certificate of occupancy).

Additionally, both Temco's expert engineer, Peraza, and Utica College's expert engineer, Lavon, opined that the Dome was not designed safely to support the snow loads prescribed by the 2010 Code.  Dkt. No. 59-15 at ¶ 4(b); Dkt. No. 68-1 at ¶ 3(b).  Instead, the experts stated that the Dome's design was based on an incorrect assumption that snow could be removed manually as permitted by ASCE 17-96 (1996) and the Dome did not provide a secondary support structure as required by the 2010 Code.  Dkt. No. 59-15 at ¶¶ 4(a), (c); Dkt. No. 68-1 at ¶¶ 3(a), (d), (m).  Moreover, Peraza opined that there was no safe access provided to the Dome's roof, and, as a result, it would not have been possible to reliably perform manual snow removal on the Dome.  Dkt. No. 59-15 at ¶¶ 4(e)-(f).  Additionally, Peraza opined that a tear in the Dome membrane due to snow overloading caused or contributed to the collapse of the Dome.  Dkt. No. 59-17 at 9.  Peraza and Lavon both concluded that if the Utica Dome had been designed as required by the 2010 Code, it would not have collapsed.  Dkt. No. 59-15 at ¶ 4(d); Dkt. No. 68-1 at ¶¶ 3(o)-(p).

The Court finds, construing the facts in the light most favorable to Utica College, that there are issues of material fact as to whether the Dome was defectively designed.  *See Monell,* 895 F. Supp. 2d at 412 (denying summary judgment when there was conflicting expert testimony that an electric scooter was safe as designed); *Humphrey v. Diamant Boart, Inc*., 556 F. Supp. 2d 167, 178 (E.D.N.Y. 2008) (denying summary judgment where plaintiff's expert testimony and other record evidence "created an issue of material fact, regarding whether the [product] was not reasonably

safe due to a design defect and whether feasible alternative designs existed").   Accordingly,

Yeadon's Motion is denied on Utica College's defective design claim as to the "other property."[38]

### B.   Temco's Motion and Yeadon's Cross-Claims for Indemnification and Contribution[39]

Temco argues that it is entitled to summary judgment on Yeadon's common law

indemnification and contribution claims because: (1) Temco was not negligent; (2) Yeadon's

negligence led to the Dome's collapse; and (3) Temco is entitled to summary judgment under the

standard in *Espinal v. Melville Snow Contractors, Inc.*, 98 N.Y.2d 136, 138 (2002), and none of

the three *Espinal* exceptions apply.   *See generally* Dkt. No. 59-18.[40]

#### 1. Common Law Indemnification

Common law indemnification "is a restitution concept which permits shifting the loss

---

[38] Utica College also argues that there is an issue of material fact as to whether the Automation System was defective.   Dkt. No. 68 at 10-11.   Because the Court finds that there is an issue of material fact as to whether the Dome was defectively designed, the Court does not need to separately address this issue.

[39] Because there was no contract between Temco and Yeadon, Yeadon is only seeking common law indemnification and contribution.   *See Westbank Contracting, Inc. v. Rondout Valley Cent. Sch. Dist.*, 46 A.D.3d 1187, 1189 (3d Dep't 2007) (noting that a party can bring an action for indemnification when there is a written contract providing for indemnification or where indemnification is implied under common law); *City of Kingston Water Dep't v. Charles A. Manganaro Consulting Engineers, P.C.*, No. 01-CV-1317 (LEK/DRH), 2003 WL 355763, at *2 (N.D.N.Y. Feb. 13, 2003) (stating that a plaintiff's contribution claim is not proper if it arises solely from a breach of contract and is only proper if the defendant "is potentially liable to [plaintiff] for a claim sounding in tort").

[40]   Yeadon argues that Temco submitted an unsworn report from Utica College's experts, without attaching an Affidavit, *see* Dkt. No. 59-9, and therefore Temco may not rely on the report under Rule 56(e).   Dkt. No. 67-3 at 6.   Temco argues that it can incorporate by reference Utica College's expert report, which was submitted in Utica College's Opposition to Yeadon's Motion and contains Lavon's sworn expert affidavit.   Dkt. No. 74-2 at 10-11 (citing Dkt. No. 68-1).   The Court agrees with Temco and will consider Utica College's expert report in connection with Temco's Motion.   *See Jeffers v. City of New York,* No. 14-CV-6173 (CBA) (ST), 2018 WL 904230, at *4 (E.D.N.Y. Feb. 13, 2018) (incorporating by reference exhibits filed on the docket in a motion for summary judgment even though the exhibits were not attached to the motion).

because to fail to do so would result in the unjust enrichment of one party at the expense of the other." *Chacko*, 568 F. Supp. 3d at 497 (internal quotation marks and citation omitted). "In a 'classic indemnification case,' the party seeking common-law indemnification has 'committed no wrong,' but has been held liable or exposed to liability to the injured party 'by virtue of some relationship with the tort-feasor or obligation imposed by law.'" *AVA Realty Ithaca, LLC v. Griffin,* 652 F. Supp. 3d 255, 265 (N.D.N.Y. 2023) (quoting *Haraden Motorcar Corp. v. Bonarrigo*, No. 1:19-CV-1079 (BKS) (DJS), 2021 WL 4906989, at *5 (N.D.N.Y. Oct. 21, 2021)). "To be entitled to common law indemnification, a party must show (1) that it has been held vicariously liable without proof of any negligence or actual supervision on its part; and (2) that the proposed indemnitor was either negligent or exercised actual supervision or control over the injury-producing work." *Id.* at 265-66 (citation omitted).

Temco argues that Yeadon is unable to meet the first prong of the test because its negligence led to the Dome's collapse. Dkt. No. 59-18 at 14-15. As stated above, there are issues of material fact as to whether Yeadon was negligent, including in its design and construction of the Dome and in its failure to warn Utica College of the Dome's snow load capability, that could have resulted in the collapse of the Utica Dome. *See supra* §§ IV(3)(b), (e), (f); *see also Wongsing v. Wal-Mart Real Est. Bus. Tr.,* No. 20 CIV. 06029, 2021 WL 5304310, at *10 n.21 (S.D.N.Y. Nov. 15, 2021) (noting that "[a]lthough violation of a local building code is not dispositive, it can constitute some evidence of negligence") (internal quotation marks and citation omitted); *Warboys v. SHI-III Briarcliff Reit, LLC*, No. 19 CIV. 2491 (PED), 2021 WL 2003192, at *5 (S.D.N.Y. May 19, 2021) ("common law indemnity is barred where the party seeking indemnification was itself at fault") (internal quotation marks and citation omitted). Therefore, the Court finds that Yeadon does not satisfy the first prong of the test for common law indemnification.

Temco also argues that Yeadon is unable to meet the second prong of the test because Temco was not negligent nor did it "exercise actual supervision or control over the injury producing work." Dkt. No. 59-18 at 15-17 (quoting *AVA Realty Ithaca,* 652 F. Supp. 3d at 265). Specifically, Temco asserts that there is no basis for Yeadon's argument that "while off-duty, [it] was obligated to clear the roof of the [D]ome with a rope, during a blizzard, in order to avert the incident." Dkt. No. 74-2 at 4. Yeadon responds that even though Utica College sent Temco home early on the day of the Dome's collapse, Temco still had the ability to remotely "perform their contractual monitoring and maintenance duties." Dkt. No. 67-3 at 13.

The Court agrees with Temco. Temco provided custodial and ground-level snow removal services to Utica College under the Temco Contract, which stated that "Temco accepts the responsibility for the supervision, cleaning/housekeeping at Utica College[.]" Dkt. No. 59-20 at ¶ 22; Dkt. No. 59-10 at 2. The Temco Contract did not address Temco's obligations with respect to the Dome. *See generally* Dkt. No. 59-10.

On the day of the Dome's collapse, Temco's HVAC maintenance team worked from 7 a.m. until 3:30 p.m., at which point they were sent home by Utica College due to the storm. Dkt. No. 59-12 at 55:5-10; Dkt. No. 60-3 at ¶ 74. Durant testified that before the Temco HVAC maintenance staff left that day, they checked the Utica Dome data and made sure that it was operating properly. Dkt. No. 59-12 at 55:20-24. Utica College did not pay Temco overtime to monitor the Dome in person or remotely after 3:30 p.m. Dkt. No. 60-3 at ¶ 73; Dkt. No. 68-5 at ¶ 73. As a result, Utica College had Campus Security who were "not trained on the operation or maintenance of the Dome," check on the Utica Dome after 3:30 p.m. Dkt. No. 60-3 at ¶¶ 75-76. The Dome collapsed at approximately 8 p.m. while Temco was off-duty. Dkt. No. 60-3 at ¶ 78.

The Court finds, as a matter of law, that Temco, after being sent home by Utica College and not being paid overtime, was not negligent in failing to remotely monitor the Dome and return to the College to manually remove snow during the snowstorm. *See Guest v. First Republic Corp. of Am.,* 618 F. Supp. 3d 86, 91-92 (N.D.N.Y. 2022) (dismissing a cross-claim for indemnification, finding that a snow-removal services contractor was not negligent because it "had no duty to monitor [the premises] for ice or salt [or to] sand the parking lot absent a specific request from the Hotel," and the Hotel did not contact the contractor to perform such services on the afternoon or evening before the accident occurred). Moreover, Temco did not exercise supervision or control over the injury producing work. *See Naughton v. City of New York*, 94 A.D.3d 1, 10-11 (1st Dep't 2012) (noting that liability for common-law indemnification "can only be imposed against a party who exercises *actual* supervision of the injury-producing work," and finding that the third-party defendant was not negligent because, on the day of the accident, there was no evidence that the third-party defendant was "present when [the] plaintiff's accident occurred" or that an employee of the third-party defendant "supervised or controlled plaintiff's work") (citing *McCarthy v. Turner Const., Inc.,* 17 N.Y.3d 369, 376, 379 (2011) (emphasis in original)).

Yeadon also argues that there is a question of fact as to whether the Dome's collapse was "due to [Temco's and Utica College's] lack of preparation and maintenance of the Dome," including its failure to remove sharp objects, which caused damage to the Dome's fabric. Dkt. No. 67-3 at 7. Temco responds that its lack of preparation and maintenance of the Dome on the day of the collapse, and its failure to call the Yeadon hotline, are "immaterial since Temco is not the owner and . . . did not cause the [D]ome['s] collapse." Dkt. No. 74-2 at 7.

It is undisputed that neither Utica College nor Temco removed sharp objects from inside the Dome. Dkt. No. 60-3 at ¶¶ 81, 85. However, the Temco Contract did not obligate Temco to

remove sharp objects from the Dome on the day of the collapse, nor did Utica College request that it do so. *See generally* Dkt. No. 59-10. Additionally, the record does not show that Mejia trained Temco to remove sharp objects from the Dome in the event of a snowstorm. *See* Dkt. No. 59-11 at 49:12-21 (Mejia testifying that aside from the Owner's Manual, he does not have any documentary evidence regarding what was covered at the training sessions); Dkt. No. 68-1 at ¶ 3(g) (Lavon opining that there is no record of Yeadon training Temco on manually removing snow).

Therefore, the Court finds that Yeadon is not entitled to common law indemnification from Temco. *See Balcazar v. Commet 380, Inc.,* 199 A.D.3d 403, 404 (1st Dep't 2021) (finding that a third-party defendant's motion for summary judgment seeking to dismiss a claim for common law indemnification should have been granted because there was "no evidence that [the third-party defendant] was negligent or that it exercised actual supervision or control over the injury-producing work," and the third-party defendant was not "onsite at the time of the accident"). Accordingly, the Court grants Temco's Motion as to Yeadon's indemnification claim.

### 2. Contribution

"[W]here a party is held liable at least partially because of its own [tortious conduct], contribution against other culpable tort-feasors is the only available remedy." *Lynn-Ford v. Shores,* No. 5:21-CV-169 (BKS/ML), 2023 WL 6133047, at *5 (N.D.N.Y. Aug. 28, 2023) (quoting *Glaser v. M. Fortunoff of Westbury Corp.,* 71 N.Y.2d 643, 646 (1988)). Under Section 1401 of the New York Civil Practice Law and Rules ("CPLR"):

> [T]wo or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.

N.Y. C.P.L.R § 1401.  "A third party will be liable for contribution only if shown to have had a part in causing or augmenting the injury for which contribution is sought."  *Reynolds v. Cnty. of Onondaga*, No. 5:22-CV-01165 (BKS) (TWD), 2023 WL 5200434, at *7 (N.D.N.Y. Aug. 14, 2023) (quoting *Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.*, 71 N.Y.2d 599, 602-03 (1988)).  Therefore, to succeed on a claim for contribution, Yeadon must establish that Temco's "negligence caused or contributed to the damage" to the Dome.  *Ilkowitz v. Durand*, No. 17 CIV. 773 (PGG), 2018 WL 1595987, at *13 (S.D.N.Y. Mar. 27, 2018).

Temco argues that Yeadon is not entitled to contribution against it because Temco had "no part in causing or augmenting the injury for which contribution is sought."  Dkt. No. 59-18 at 16.  The Court agrees.  As set forth above, *see supra* § IV(B)(1), the Court finds that Temco was not negligent and therefore it did not cause or contribute to Utica College's damages.  *See Guest*, 618 F. Supp. 3d at 91 (dismissing a cross-claim for contribution against a co-defendant contractor who was not negligent); *Bellis v. Tokio Marine & Fire Ins. Co.,* No. 93 CIV. 6549 (DAB), 2002 WL 193149, at *19 (S.D.N.Y. Feb. 7, 2002) (dismissing a cross-claim for contribution when there were "no facts alleged that demonstrate [the third-party defendant] committed any tort for which contribution may be sought").  Accordingly, the Court grants Temco's Motion as to Yeadon's contribution claim.[41]

---

[41] Temco argues that the Court may also award summary judgment on Yeadon's common law indemnification and contribution claims pursuant to *Espinal*, 98 N.Y.2d 136, and no exceptions to the *Espinal* rule apply.  Dkt. No. 59-18 at 17-19; *see Espinal*, 98 N.Y.2d at 138 ("a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party").  Yeadon argues that there is a question of fact as to whether two of the *Espinal* exceptions apply.  Dkt. No. 67-3 at 8-14.  Because the Court has found, as a matter of law, that Temco was not negligent, the Court does not address the parties' arguments related to whether any of the exceptions to the *Espinal* rule apply.

V.      **CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that Yeadon's Motion, Dkt. No. 60, is **GRANTED** in part, and **DENIED** in part, as set forth in Section IV of this Memorandum Decision and Order; and the Court further

**ORDERS** that Temco's Motion, Dkt. No. 59, is **GRANTED** in its entirety and Yeadon's Third-Party Complaint, Dkt. No. 35, is **DISMISSED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: <u>March 12, 2024</u>
      Albany, New York

Anne M. Nardacci
U.S. District Judge